**EBBERTS et al. v. CARPENTER PRO-
DUCTION CO.**

No. 4725.

Court of Civil Appeals of Texas. Beaumont.
March 12, 1953.

Rehearing Denied March 20, 1953.

John L. Bell and Bruce Votaw, Beaumont, C. M. Hightower, Liberty, for appellants.

King, Sharfstein & Reinstra, Beaumont, for appellee.

WALKER, Justice.

The plaintiffs in this suit, and one of the two groups of appellants, are M. J. Ebberts and wife, Mittie Ebberts. The defendant, and the sole appellee, is the Carpenter Production Company. The other group of appellants are intervenors.

The plaintiffs sued to rescind transfers of property made by a bill of sale, two assignments of oil and gas leases, and a deed. The first three of these instruments were executed by Ebberts alone and were dated December 28, 1943; but the deed was executed by both Ebberts and Mrs. Ebberts and it was dated December 29, 1943. These papers were incidents of a sale of the transferred property, plaintiffs being the sellers and defendant being the purchaser; and these papers are the only memorial of the terms of the contract of sale.

The intervenors sought to have one of the oil and gas leases transferred to defendant declared at an end and to recover damages from defendant for the destruction of an oil well. The lease is that referred to hereinafter as the Hebert lease of 1940, or July 5, 1940, and the well, that situated on Lot 9.

The land conveyed to defendant by Mr. and Mrs. Ebberts' deed belonged to the separate estate of Mrs. Ebberts. It was a part of a subdivision of a larger tract, and for convenience we shall describe it as lots 8, 19, 22, and 23, and a one-third undivided interest in lots 6, 7, 11 to 16, inclusive, and lots 81 to 90, inclusive. Mrs. Ebberts reserved a one-eighth royalty in the oil, gas and other minerals in the property which she conveyed. This was a full one-eighth in the four lots wholly owned by her and a one-twenty-fourth in the eighteen lots of which she owned a one-third.

Each of these lots and each of the lots in this particular subdivision was an acre, or approximately an acre in size, and the lots are sometimes referred to in the proof as an acre.

The property conveyed to defendant by the papers which only Ebberts executed, namely, the bill of sale and the two assignments of oil and gas leases, belonged to the community estate of Mr. and Mrs. Ebberts; but legal title to this property was formally vested in Ebberts.

All of the land and interests in land conveyed to the defendant was in the Sour Lake Oil field in Hardin County, in an area which had produced oil for many years.

One of the leases assigned to defendant covered only lots 6 and 7, which were owned in undivided thirds by Mrs. Ebberts, one Jackson, and intervenors. The terms of this lease were not proved and it seems not to be involved in the conflicting claims of the parties or to be material to the issues made on this appeal except as its ownership may finally be affected by the judgment rendered. Ebberts' assignment described it as being dated October 19, 1943, and as made to Ebberts as lessee by Ebberts and Mrs. Ebberts and the other owners. The other lease assigned to defendant by Ebberts is of the utmost materiality to the claims of the parties, and it is referred to hereinafter as the Hebert lease of 1940, or July 5, 1940. It is dated July 5, 1940, and was made to Ebberts as lessee by intervenors as lessors. It was for a primary term of 5 years and as long thereafter as oil or gas should be produced. Subject to one-eighth royalties, it conveyed the oil and gas in lots 9, 18, 20, 21, 78, 79 and 80 of the subdivision in which Mrs. Ebberts' lots were situated. The lots mentioned in the Hebert lease belonged to intervenors. Ebberts was lessee as stated, but he and Mrs. Ebberts, or Mrs. Ebberts alone, had or were treated as having an interest in the income from these lots under and by virtue of the contract now to be mentioned.

On January 10, 1914, many years before the present controversy arose, Mr. and Mrs. Ebberts made a written agreement with Mr. and Mrs. J. J. Hebert which provided that "any revenues or monies derived from the mineral rights" in certain property "shall be divided equally and paid half" to Mr. and Mrs. Hebert and half to Mr. & Mrs. Ebberts "or their heirs and assigns." Some of the property described in this agreement belonged to Mrs. Ebberts and some of it belonged to Mrs. Hebert, and Mrs. Ebberts' part included lot 19 and other lots which, or an interest in which, Mrs. Ebberts conveyed to defendant by her deed of December 29, 1943; and Mrs. Hebert's part included the lots which were covered by the Hebert lease of 1940. Mr. and Mrs. Hebert were the parents of those of the intervenors who are interested parties (not formal parties) other than the widow of J. J. Hebert, Jr., who was the son of Mr. and Mrs. Hebert. Mrs. Ebberts and Mrs. Hebert were sisters. After this contract was made Mrs. Ebberts continued to be the owner of lot 19 and the other property described as hers in the contract down to the time she conveyed the property to defendant. J. J. Hebert died in 1925 and Mrs. Hebert died in 1939, and intervenors (for convenience we shall identify the widow of J. J. Hebert, Jr.,

with her husband) inherited their mother's title. Throughout the years since this contract was made it was complied with by the parties to the agreement and by intervenors until it was terminated by another agreement, dated July 2, 1947, in which Mrs. Ebberts (joined by her husband) and the intervenors granted each other interests in the royalties or minerals produced from their respective properties. We note that while the contract of 1914 was in force the landowners seem to have construed it as being only an agreement in personam (or covenant running with the land) which conveyed no interest in the various lots mentioned in it.

The consideration paid plaintiffs by defendant for the transfers of December 28 and 29, 1943, is not fully stated in the documents of transfer. A part of this consideration was paid in cash and amounted to $13,300. We have concluded that $800 of this sum was paid to Mrs. Ebberts and that $12,500 was paid to Ebberts. This $12,500 was actually deposited in a bank to the joint credit of Ebberts and an officer of the defendant corporation named Frank Carpenter, and most of it was paid out by them to creditors of Ebberts but a small part, perhaps $1,500 was left after these payments were made, and this sum was then released to Ebberts.

The cash payments to Mr. and Mrs. Ebberts are not mentioned in any of the four documents of transfer. Mrs. Ebberts' deed refers in general terms to some cash consideration without specifying it and Ebberts' two assignments of oil and gas leases contain only formal recitations of consideration. However, the bill of sale refers in general terms to some cash consideration and also to some consideration which was to be paid in the future. This bill of sale purported to transfer certain oil field equipment and it recited that "I, M. J. Ebberts, for and in consideration of—($1.00) and other good and valuable consideration to us in hand paid by (defendant), the receipt of all of the cash consideration for which is hereby acknowledged, and the further consideration of the oil payment hereafter set forth have (transferred to defendant the personal property

mentioned). As a part of the consideration for this bill of sale, grantee agrees to pay to grantor an oil payment in the total —of—($10,000.00)—payable only out of the proceeds of any oil run from production had from the hereinafter described *wells* now situated on said property, but not producing, as follows, to-wit: 1. The sum of—($5,000.00)—payable only out of the proceeds of—(1/4 of 7/8) of any and all oil produced and sold from well situated on Lot—(9) of said—subdivision, which said well is not presently producing and in which some tubing and rods are stuck; and (2) the sum of—($5,000.00)—payable only out of the proceeds of—(1/4 of 7/8) of any and all oil produced and sold from that certain well situated on Lot—(18) of said—subdivision, which said well is not presently producing and has no derrick over same. It is understood and agreed that no part of the oil payment hereby provided for shall be payable to grantor except it be paid from the proceeds of oil produced and sold from the two wells expressly mentioned above and in the sum and manner provided for above."

The negotiations for the purchase and sale of plaintiff's property were conducted by Carpenter for the defendant and by Ebberts for the plaintiffs. Mrs. Ebberts never talked with Carpenter about the sale of the property; she dealt with Carpenter through her husband. As the time of these negotiations Carpenter was the Secretary-Treasurer of the defendant corporation and he has continued in that office since that time. He has been treated by the plaintiffs as the alter ego of the defendant corporation, and his own way of speaking while giving testimony shows that he has done the same thing. We infer, from his testimony, that at all times relevant to the issues between the parties he was in the actual charge and control of the defendant's operations concerning and on the property in suit.

Carpenter, who was a lawyer, wrote the four documents of transfer, at his own suggestion. Ebberts was not a lawyer but had had many years of experience in the production of oil from the property conveyed to defendant and from other property near-

by and elsewhere in the Sour Lake oil field; and Carpenter was also experienced in the production of oil in the same area and in the oil business. The two men had been acquainted for many years and were on friendly terms, but there was no special relation of confidence and trust between them. Carpenter delivered the documents in blank to Ebberts, and Ebberts took them away with him to his home in another town and there he and Mrs. Ebberts read them over, privately and at their leisure. Ebberts accepted without change the papers which were to be executed by him alone. Mrs. Ebberts objected to the form of the royalty reservation in her deed, that it did not extend to minerals other than oil and gas; and when Ebberts took back the papers to Carpenter on the next day he requested Carpenter to enlarge the reservation accordingly, and Carpenter did so, making the appropriate change in the terms of the reservation. Ebberts delivered his own transfers to Carpenter but took back the deed to Mrs. Ebberts for her signature. These circumstances explain the difference between the date of Mrs. Ebberts' deed and that of the other papers.

When Carpenter and Ebberts were conducting their negotiations and when plaintiffs executed their transfers to defendant it was represented to Carpenter by Ebberts that three wells, one producing and two not producing, were being transferred to defendant. Ebberts took Carpenter to the land and pointed out these wells and represented to Carpenter that the producing well was located on Mrs. Ebberts' lot 19, which we have referred to above as one of the lots covered by the agreement of 1914 between Mr. and Mrs. Ebberts and Mr. and Mrs. Hebert, and he represented further that the two dead wells were on lots 9 and 18, respectively, which belonged to intervenors and were covered by the Hebert lease of 1940. Carpenter accepted Ebberts' representations as being true and acted on them in making the purchase from plaintiffs. Ebberts said that he thought that the representations were true when he made them and there is much evidence which supports his testimony. However, there is some evidence to the contrary. At any rate, as a result of the plaintiffs' formal admission in writing, filed during the trial of this cause, the facts between the plaintiffs and the defendant are that Ebberts' statements about the location of the two wells were wrong, and that the well which he said was on Mrs. Ebberts' lot 19 is actually on intervenors' lot 18 while the well he said was on intervenors' lot 18 is actually on a lot 17 which belongs to third parties unless intervenors have acquired title to it by adverse possession.

Neither Ebberts nor Carpenter realized that they were dealing with a lot 17, during their negotiations or in the sale, and neither of them intended to do so.

Intervenors did not join in plaintiffs' admission and they claim that it was of no effect against them.

After the completion of the sale, defendant took possession of the three wells and of other property transferred by plaintiffs; and Carpenter said that in August, 1944, eight or nine months after he made the purchase from the plaintiffs, he attempted, acting in defendant's behalf, to restore the well to production which he supposed to be on lot 18, and that after completing this work he was informed, about September 5, 1944, by a subordinate employee that the well was on lot 17. He said that it was on this occasion that he first learned of the mistake concerning the location of the wells. He did not mention this to Ebberts and Ebberts claimed that he never knew of the mistake until after the suit was filed. As we have stated, there is evidence to the contrary.

The work which Carpenter did on the well supposed to be on lot 18 accomplished nothing; and the evidence is in conflict, both as to what he did and as to when he did it. Thus, Ebberts said that the work was done in the late spring or early summer of 1945 (instead of August or September of 1944) and that it was abandoned on the day after it began.

No attempt to restore the well on lot 9 to production was ever made by defendant.

No part of the oil payments reserved by Ebberts in his bill of sale has ever been paid.

The well on lot 9 and that supposed to be on lot 18 were destroyed by the defendant in either 1947 or 1948 by pulling the casing out of the ground. Carpenter testified, in effect, that this was a consequence of a mistake; he told a new employee to pull the casing from defendant's dead wells and did not tell him *not* to pull the casing from these particular wells.

The well which Ebberts represented to be on Mrs. Ebberts' lot 19 was producing at the time of the sale to defendant, and with some interruptions which are immaterial it has produced oil continuously since that time. The defendant has operated this well since the date of plaintiffs' transfers; and royalties from the production have been regularly and consistently paid to Mrs. Ebberts and to intervenors as the agreement of 1914 between plaintiffs and intervenors' parents required, that is, 1⁄16th to Mrs. Ebberts or to Mr. and Mrs. Ebberts and 1⁄16th to intervenors.

The total royalty from the producing well is the same, whether calculated by the royalty reservation in Mrs. Ebberts' deed or by the Hebert lease of 1940. Thus, so far as only actual income was concerned, it was immaterial to the plaintiff and to the intervenors whether defendant paid the royalty under Mrs. Ebberts' reservation or under that in the Hebert lease of 1940. Defendant, according to Carpenter's testimony, and there was no other evidence, paid the royalty under Mrs. Ebberts' reservation until the well was discovered to be on intervenors' lot 18; but afterward Carpenter's testimony necessarily implies that defendant paid it under the reservation in the lease.

The only production which defendant has had in the land purchased from plaintiffs was that from this producing well.

Other than the abortive work done on the well supposed to be on lot 18 and other than the operation of the producing well, the defendant has done nothing to keep the Hebert lease of 1940 in force. Carpenter said that after he discovered the mistake concerning the location of the producing well he intended to and did keep the Hebert lease in force by the production from this well.

By a deed dated February 25, 1944, defendant acquired from one J. Milton Jackson a one-third interest in those lots in which Mrs. Ebberts had conveyed a one-third, and in two more lots, Nos. 3 and 4, not referred to in Mrs. Ebberts' deed, subject to a 1⁄24th royalty in the oil and gas. Carpenter also handled this transaction and said that he paid Jackson $800 for the deed; this was the same price which he said he had paid Mrs. Ebberts.

Intervenors owned the other one-third in the lots in which Mrs. Ebberts had conveyed one-third, and they declined to convey their interest to the defendant. Accordingly, the defendant, acting through Carpenter, procured a lease from intervenors covering their one-third interest in the oil, gas and other minerals in these lots. This lease was dated September 25, 1946, and was for a primary term of 10 years.

By this instrument the defendant finally acquired the ownership, either fee title or conditional and all subject to royalties, of the minerals in the 18 lots in which Mrs. Ebberts had conveyed a one-third interest to defendant; and the defendant subsequently made some efforts to develop the property. Thus, in January, 1947, the defendant drilled a well on lot 82. This well proved to be dry. Further, on January 28, 1949 (this suit was filed on March 8, 1949, less than two months afterward) the defendant conveyed a leasehold on lots 11 to 16, inclusive, to one W. O. Newton by two instruments. One of these was a lease on defendant's two-thirds interest and the other was an assignment of a part of the intervenors' lease of 1946. These transfers to Newton reserved royalties which covered the royalties outstanding and which would pay an additional one-twenty-fourth to the defendant. Newton drilled two wells, both on lot 16. The first well produced oil for a short time but the second was not completed or proved to be dry. At least some of this work was done after this suit was filed.

However, plaintiffs admit that Newton was a purchaser for value, etc., of the legal title and thus, that he has title against them to the interest which defendant conveyed to him.

These facts show the background of the suit and, with such additional statements as are hereinafter made, will explain our adjudication of the points of error. Details upon which some of our conclusions are based are stated in the findings which we have filed independently.

The cause was tried to the court with a jury, but the trial court instructed the jury to return a verdict in behalf of defendant against both the plaintiffs and the intervenors, and judgment was rendered accordingly, that the plaintiffs and the intervenors take nothing against the defendant. No other relief was awarded the defendant.

From this judgment the plaintiffs and the intervenors have appealed, and they have filed a joint brief in which they assign 60 points of error for reversal. Most of these points raise difficult and complex questions of law and fact which are material to the judgment to be rendered in this court and require discussion for that reason.

Only two witnesses testified, one being defendant's officer Carpenter and the other being the plaintiff M. J. Ebberts.

### Opinion.

Points 1 to 7, inclusive, state rules for construing contracts and need not be discussed in detail; but in the argument under these points the plaintiffs say that the proof shows either as a matter of law that a single contract, to which Ebberts and Mrs. Ebberts and the defendant were the contracting parties and which was memorialized by the four documents of transfer, was made between the plaintiffs and the defendant, or else that an issue was raised for the jury as to whether such a contract was made. The plaintiffs say that Ebberts testified that "there was but one trade or transaction" and that Carpenter first said that defendant made two contracts, one with Ebberts and one with Mrs. Ebberts, and then said that only one contract was

made. As we interpret his testimony Ebberts never said how many contracts were made and Carpenter did not retract his statement that there were two contracts.

The proof certainly shows as a matter of law that two sets of conveyances were made. One was a transfer and conveyance of some community property of Mr. and Mrs. Ebberts' to which Ebberts had legal title. It was accomplished by three instruments, the bill of sale and the two assignments of leases; and it was made by Ebberts alone. Mrs. Ebberts was not a party to these instruments; and there is nothing to show that she was consulted by her husband about this part of the transaction or that she took any part in it. The tenor of the evidence is that Ebberts acted independently of his wife in determining to make, and in making these transfers. The other conveyance was a transfer of property belonging to Mrs. Ebberts' separate estate, and it was accomplished by the deed of herself and Ebberts to the defendant. According to Ebberts' testimony, the decision to make this conveyance was made by Mrs. Ebberts herself.

However, it really is not necessary to determine how many contracts were made. The significant questions concern the nature of the consideration given by defendant for the two sets of transfers, and the identity of the persons to whom this consideration was paid or was to be paid.

In our preliminary statement we have shown that the consideration paid by defendant included some cash and some oil payments. According to plaintiffs' brief the money amounted to $13,300. Plaintiffs' brief thus adopts testimony of Carpenter because Carpenter testified that two sums, namely a $12,500 and an $800, which total $13,300, were to be paid, and Ebberts only mentioned the $12,500. He never did refer to a $13,300 and he never did say whether any independent consideration was or was not to be paid to Mrs. Ebberts for her deed. Carpenter said that the $800 was the consideration offered and paid to Mrs. Ebberts for her deed, and since this testimony is the only explanation for the sum of $13,300 which, the parties agree, was paid, we shall accept it as true. Defendant, then,

gave Mrs. Ebberts an independent consideration of $800 for her deed.

The testimony of both Ebberts and Carpenter shows that the $12,500 and the oil payments were to be paid to Ebberts alone. It is unnecessary to quote Carpenter. As we interpret the testimony, Ebberts, as the successor of a series of partnerships, considered himself to be the owner of the producing oil well which he told Carpenter was on his wife's lot 19, as well as the owner of the equipment and the leases he sold to defendant, and he first made an offer to Carpenter to sell all of this property, including the producing well, to the defendant for $25,000 in cash. Carpenter rejected this offer. Ebberts said that Carpenter then "came forward with another proposition, saying that if I could persuade *my wife* to *sell* the fee interest in the land she owned in the area that he would do everything necessary to put these two wells which were sanded up into production. —That he would do every thing possible to bring these two wells in production by cleaning them out or reworking them and then he would pay *me* out of production of each well $5,000—and that he would pay *me* $12,500 for the production he had." Other testimony of Ebberts adds nothing to the substance of this quotation, and the quotation may be accepted as Ebberts' version of the counter offer made to him by Carpenter. This counter offer was eventually accepted by the plaintiffs.

■ The promise expressed in this quotation is, in terms, a promise to pay Ebberts; nothing is said about paying anything to Mrs. Ebberts or to anyone for her benefit; and the subsequent conduct of the parties was in accord with this promise. Thus, the $12,500 was paid to Ebberts. Most of it was paid out to Ebberts' creditors; but, of course, this was a payment in legal effect to Ebberts himself. Certainly the persons to whom this money was paid were not Mrs. Ebberts' creditors and none of them had any lien on Mrs. Ebberts' separate estate. Carpenter said that he gave Ebberts a check for $800 which was payable to Mrs. Ebberts, for delivery to Mrs. Ebberts. Ebberts did not deny this and he did not, in fact, refer to the $800. Further,

the form of the reservation is in accord with the ostensible ownership of the property in which the reservation was made and with the nature of the document in which the reservation appears. The title to the two wells which were to be reworked were represented to Ebberts to be on the Hebert leasehold and thus covered by the Hebert lease of 1940, to which he had title and which he proposed to sell to defendant. On his representations, the promise to rework the dead wells concerned his own property; and the oil payment which was reserved to Ebberts was thus reserved in property purportedly owned by him. The oil payments were reserved in the bill of sale, that is, a transfer executed by Ebberts alone. Doubtless these circumstances account for the fact that the reservation was made to Ebberts alone. Further, these oil payments, although involving promises of future performance, were interests in land and as we have stated, were reserved in property ostensibly belonging to Ebberts. Under the form of the reservation Ebberts necessarily had the same title to these oil payments as he had to the leasehold in which they were reserved but which he sold to defendant. Mrs. Ebberts had a community interest in this leasehold and so she had exactly the same sort of interest in these oil payments which were reserved in this leasehold.

■ Thus, in so far as there may have been executory promises by the defendant concerning these oil payments which were a part of the consideration given by the defendant for the sale to defendant, these promises ran to Ebberts, not to Mrs. Ebberts, and such rights against defendant as may have resulted from a breach by defendant were in favor of Ebberts (doubtless as community property but nevertheless to Ebberts), not to Mrs. Ebberts. Further, this executory part of the consideration must be referred to and held to be consideration for Ebberts' action, that is, for his own transfers, and not for Mrs. Ebberts' deed. We think the proof shows as a matter of law that the oil payments were a part of the price paid for Ebberts' transfer of the community property, either the equipment transferred by the bill of

sale, or this plus the two leases and Ebberts' interest in the producing oil well which he told Carpenter was on his wife's property. This conclusion is in accord with Ebberts' bill of sale and it is also in accord with the recitation of consideration in Mrs. Ebberts' deed, which reads: "—the sum of—($10.00)—and other cash consideration to me (the reference is to Mrs. Ebberts) in hand paid by Carpenter Production Company—the receipt of all of which is hereby acknowledged, and the further consideration of the royalty reservation hereinafter set forth—." This statement by Mrs. Ebberts, in her deed to the defendant, that the consideration for the deed was all cash and royalty is in accord with Carpenter's testimony, and as we have stated, Ebberts never did testify about the consideration for his wife's deed or that extra $800 which must be added to the $12,500 in order to make up the $13,300 which the plaintiffs' brief says that they received.

The fact that Ebberts had no lease or other written title to the producing well which he told Carpenter was on his wife's property raises the question, why should defendant have paid Mrs. Ebberts so very much smaller a sum of money than was paid to her husband. However, the evidence shows that both Carpenter and Ebberts regarded this well and the "working interest" therein as the property of Ebberts. Thus, in the quotation above from Ebberts' testimony, Ebberts said that "he (that is, Carpenter) would pay me $12,500 for the production he had." The well was drilled in 1934 by, and was thereafter operated by, a partnership of which the members were Ebberts, one Falloure, and what Ebberts insisted on calling the Hebert estate. This estate, according to Ebberts, was represented by Mrs. Lula Hebert, the widow of J. J. Hebert, Sr., who had been the partner of Ebberts and Falloure until his death in 1925. Subsequently, Falloure died and later, Mrs. Hebert, and still later, Mrs. Hebert's successor in the partnership, her son J. J. Hebert, Jr., who acted for himself and intervenors, and it was finally wound up in July, 1940, by a series of writings made by Ebberts and the intervenors. As a result of transfers which accompanied various changes in the membership of the firm, Ebberts succeeded to the partnership's assets and this producing well was originally regarded as one of them. Thus, Ebberts testified: "Q. Now, in the operation and production of the well on lot 21, and subsequently the well on what you thought was lot 19, those two wells were operated for whose account? A. For the partnership until I took the lease in 1940 from the Heberts and operated it for my own." He testified further: "Q. And then after you made this partnership arrangement with Joe Hebert, Jr., you all continued to operate the well on 19, what you thought was 19, until his death in March of 1940? A. Yes, sir." Details are stated in our supplemental findings. Note that the table at S.F. 570 shows that Mrs. Ebberts only got her half of a one-eighth royalty, the other half being paid to her sister, Mrs. Lula Hebert, and after the latter's death, to intervenors, as the contract of 1914 between the Ebbertses and Heberts required; the working interest went elsewhere to parties whose lack of connection with the title implies that they were creditors of the persons operating the "working interest", and the partnership did this until it was wound up in July, 1940. If, on the other hand, Ebberts, did not think the well was on his wife's property, then he knew it was on the Hebert leasehold, to which he did have a written title. Actually, this record suggests, but does not prove or disprove, that even if the well was on lot 19 the partnership, and Ebberts by succession, had a title to the well which was enforcible in equity.

On the assumption that the well was thought to be Ebberts', the difference between the sum paid to Mrs. Ebberts and the sale value of her property was probably not so great. For Mrs. Ebberts reserved the income, that is, the royalty she was receiving from the producing well and also the same royalty in wells which might be drilled. And about 2 months after she made her deed to defendant, Carpenter bought for defendant from Jackson a one-third interest in the same eighteen lots in which Mrs. Ebberts had conveyed a one-third, and in two lots additional, subject to a royalty reservation equal to that reserved

by Mrs. Ebberts; and for this paid the same price which he said he had paid to Mrs. Ebberts. It is true that Mrs. Ebberts conveyed more property than Jackson did, but the price paid to Jackson is some indication of the sales value of the property sold by Mrs. Ebberts. All of these lots were in the same subdivision and all near the producing lots.

One question remains, to which plaintiffs attach much importance. In his statement of Carpenter's counter offer, Ebberts testified that Carpenter said "that he would do everything necessary to put these two wells which were sanded up into production. * * * That he would do everything possible to bring these two wells in production by cleaning them out or reworking them and then he would pay me out of production of each well $5,000 * * *." Ebberts said that he relied on this promise to rework the dead wells and said further, in effect, that plaintiffs would not have made the sale to defendant if this promise had not been made. If this promise had been performed, the defendant would not only have made payments on the oil payments; defendant would also have paid royalties under the Hebert lease of 1940, and by virtue of the agreement of 1914 between the Ebbertses and the Heberts one-half of these royalties would have been payable to Mrs. Ebberts, or to her and her husband.

The question is, whether the possibility of this income was a part of the consideration for the sale of plaintiffs' property. It is to be borne in mind that Mrs. Ebberts was not a party to the Hebert lease and owned no interest in the land it covered unless the contract of 1914 gave her an interest, and as we have stated, the parties acted as if it had not. It is also to be borne in mind that Ebberts offered to sell to defendant, and finally did sell to the defendant, his entire interest in the lease except the reserved oil payments; and he had no other interest in the land covered by the lease except, perhaps, under the contract of 1914. Thus on the surface of the transaction between Ebberts and Carpenter there was nothing to suggest to Carpenter that plaintiffs intended to charge the defendant with this indirect, possible income under the contract of 1914 as a part of the price to be paid by the defendant for their sale. We do not find that this possibility of income, these possible royalties, to Mrs. Ebberts (or to her and Mr. Ebberts) were ever mentioned to Carpenter or that this contract of 1914 was discussed by Carpenter and Ebberts. Carpenter said that he had known of the agreement but he did not know whether it had influenced him or not. Under the circumstances, we conclude that the possibility of income from royalties out of the dead wells accruing under the Hebert lease of 1940 may have been a motive for Ebberts' original determination to sell the property, but it was not, as a matter of law, a part of the consideration for the sale to the defendant because it was not bargained for by the plaintiffs as consideration for the sale and it was not promised as such by the defendant. See: Restatement of Contracts, Sec. 75; Williston on Contracts, 2nd Ed., Sections 100 and 111; Johnson v. Breckenridge-Stephens Title Co., Tex.Com.App., 257 S.W. 223; Hardwicke v. Trinity Universal Ins. Co., Tex.Civ.App., 89 S.W.2d 500, at page 505 (Hns. 11-14); Hoffer v. Eastland National Bank, Tex.Civ.App., 169 S.W.2d 275. We think that the promise to which Ebberts testified was one to rework the wells in order to produce the oil payments.

Points 8 and 9 and Points 12 and 13 may be summarized as follows: (1) There was a promise by defendant to make a good faith effort to recondition the two non-producing wells, either to be implied from the terms of the oil payment reservation in the bill of sale or provable by parol evidence because of an ambiguity in this reservation. (2) This promise was, as a matter of law, the real consideration passing to the plaintiffs for their transfers to defendant because the property which they transferred was so much more valuable than the money paid to the plaintiffs; or else it was an issue for the jury whether, under the circumstances, this promise was the real consideration. (3) Defendant's failure to perform this promise therefore amounted to a total failure of considera-

tion for which the contract should have been canceled, or else it was an issue for the jury whether the contract was supported by an adequate consideration.

In Point 14 it is contended that the failure to recondition the well on lot 9 was alone so material a partial failure of consideration as justified cancellation of the entire contract of purchase and sale.

Points 10 and 11, which are included in the group of Points 8 to 14, inclusive, and are discussed with the other points in this group seemingly raise a promise quite different from that asserted under the other points in this group. In Points 10 and 11 plaintiffs say that the defendant promised to recondition the non-producing wells or to do other development in order to keep the Hebert lease of 1940 in force, and that defendant admitted that the contract of purchase and sale was made on the assumption that no production existed on the Hebert lease and that either· reconditioning or development was necessary to keep the lease in force; or else all of these matters raised issues for the jury.

We shall first discuss Points 10 and 11. There is no evidence that defendant has ever admitted that development work of any kind, by reconditioning the non-producing wells or otherwise, was necessary to keep the Hebert lease of 1940 in effect during the primary term of that lease. Carpenter testified to the contrary; he said that before transfer was made to the defendant he read the Hebert lease of 1940 and construed it as granting a 5-year term absolutely; and he subsequently told Ebberts that he construed the lease in this way. So far as this record shows this construction has always been placed on this lease by Carpenter, with whom both parties identify the defendant. As for work after the end of the 5-year primary term, the defendant's position is that the producing well, which has produced oil continuously since its transfer to the defendant, kept the Hebert lease of 1940 in force. Carpenter though that this well was outside of the Hebert lease when he made the agreement of purchase and sale with Ebberts. Thus at this time he necessarily believed that the Hebert lease of 1940 would expire at the end of its primary term unless oil was then being produced under the lease or development was then going forward; but he says that he discovered his mistake when the attempt was made to recondition the well supposed to be on lot 18. He puts this in 1944, which was during the primary term of the lease. Ebberts, however, said in indefinite terms that this occurred during the late spring or early summer of 1945. Thus it may have been (we think not) a jury issue, whether Carpenter, during its primary term, claimed for the defendant a continuance of the lease by virtue of the producing well; but this is as far as the proof goes in favor of the plaintiffs.

■ Plaintiffs argue under this group of points, and we assume that this argument is to be referred to Points 10 and 11, that the defendant assumed certain obligations by taking the assignment of the Hebert lease of 1940 from Ebberts. As we construe the argument, the plaintiffs do not claim that the defendant expressly promised a performance of the obligations said to have been assumed; seemingly they claim that these obligations were only implied under the terms of the Hebert lease and were as follows: (a) to do further development work (and thereby keep the lease in force, apparently on the theory that production from the non-producing wells had abrogated the 5-year primary term) and (b) to protect the leasehold from drainage. These obligations, as we understand the plaintiffs' argument, were already charged upon the lessee, that is, Ebberts, under the lease when the assignment came to be made to defendant, and were assumed by the defendant when the lease was transferred to the defendant. We are not satisfied that the proof shows that drainage was, in fact, occurring; but it must be noted that such obligations implied under the terms of the Hebert lease of 1940 would run to the lessors, that is, to the intervenors, and would not run to the lessee/assignor (Ebberts), and that unless the lessee/assignor made some provision concerning these obligations in his contract of sale to defendant, his interest in the performance of these obligations

would necessarily be limited to the effect upon him which his assignees' failure to perform these obligations might have, and further, that he would have no interest here unless he remained in some way liable upon these obligations. So far as the Hebert lease of 1940 is concerned it only provided as follows: "If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, *successors or assigns* \* \*." Ebberts' assignment of this lease to the defendant does not refer to such obligations nor does any of the other instruments of transfer; and there is no evidence of any promise by the defendant except that of Carpenter's to which Ebberts testified, namely, that he would attempt to recondition the non-producing wells.

Further, it is to be noted that intervenors, who are the lessors in the Hebert lease of 1940, are not attempting to charge any liability upon Ebberts because of defendant's failure to comply with any implied obligation which might be chargeable against the defendant under the Hebert lease of 1940, and that the intervenors actually are not attempting to enforce any such implied obligations. They do claim that their lease of 1940 expired, but this claim is founded upon certain provisions of the lease and upon the further claim that the leasehold was abandoned.

Under the circumstances, it is not apparent to us why any implied obligation which the defendant may have owed to the intervenors under Ebberts' asssignment is material to this cause except as it may bear upon the question, whether a promise is to be implied from the terms of the oil payment reservation. We pass accordingly to a consideration of the other Points of Error in this group.

■ The first question raised by plaintiffs' assertion of an implied promise concerns the terms of this promise. We hold that if any promise is to be implied it is only a promise to make the oil payments if oil sufficient will flow through the wells in which the payments were reserved.

This would be a promise conditioned on the availability of oil but not on the defendant's will to attempt to produce the oil. Necessarily, the wells would have to be reconditioned because the payments must come from these wells; and necessarily the Hebert lease of 1940 must be, or be kept, in force for some period of time because the oil payments must come from the leasehold granted by this lease. But reconditioning the wells and keeping the lease in force are only incidents of the promise to make the oil payments; and had the defendant wished to discharge all possible liability concerning these oil payments we see no reason why defendant could not have done this by simply paying the maximum amount of the payments, that is, the sum of $10,000 in cash, and thereby have made it unnecessary to recondition the non-producing wells or to keep the Hebert lease in effect. The object of the implied promise would be the payment of the money represented by the oil payments, and the conditions of this promise would be for Carpenter's benefit, not Ebberts'. Carpenter could waive these conditions if he so desired. As we construe Ebberts' testimony about Carpenter's counter offer to him, this counter offer was a promise to do no more than recondition the non-producing wells in order to make the oil payments. This and the implied promise we have stated differ only as regards the obligation, or not, to rework the dead wells. The objects are the same.

Such an implied promise as we have stated would, of course, be worth to promisee (Ebberts) nor more than $10,000.

Whether this promise (conditioned upon oil but not on the defendant's will) should be implied as an incident of the oil payment reservation is a serious question. The oil payments were certainly a material part of the consideration bargained for by Ebberts for his transfer to the defendant, and it may be argued that the defendant did not have an absolute right to surrender the Hebert lease of 1940 because of implied obligations to the lessees (intervenors), which were raised by the production of oil from the leasehold under the Hebert lease.

This argument would be decidedly stronger under the defendant's construction of that lease than under the plaintiffs', who would have the lease expire 90 days after the non-producing wells ceased to flow. This is the only relevance which the obligations implied under the Hebert lease of 1940, charged against the defendant by the plaintiffs, bear to the issues between the plaintiffs and the defendant. The case is not like those where the courts have declined to imply an obligation on the part of the assignee to make an oil payment, given as consideration for the assignment, where the lease assigned was terminable at the lessee's will. There the implication would be inconsistent with the nature of the property sold and transferred; but this inconsistency would not exist here and the implication of a promise to attempt to produce is more consistent with the parties' intentions. There seems to be authority for implying a promise to make the oil payments. See: Van Every v. Peterson, 5 Cir., 24 F.2d 26. However, for reasons hereinafter stated in our discussion of points following, it is unnecessary to determine whether a promise to make the oil payments shall be implied. We add the following comments concerning other elements of the arguments made under this group of points.

 A promise to rework the non-producing wells was not, in law or in fact, the real consideration for the sale and transfer made to the defendant. According to Ebberts' testimony, Carpenter promised to attempt to recondition the non-producing wells and this promise was an essential part of Ebberts' agreement with Carpenter, but it could be nothing more than a material part of the consideration promised Ebberts under Ebberts' version of that agreement. As we have said, we construe Ebberts' testimony as showing that this was a part of the consideration promised him for his own action, and was not a part of the consideration promised Mrs. Ebberts. The proof shows as a matter of law that Ebberts also received $12,500 from Carpenter and that this sum was also a part of the consideration given Eb-

berts for his transfers. This sum of money was legally sufficient to support Ebberts' transfers regardless of the values of the property sold and transferred by Ebberts, and the values of those properties are immaterial to the question, whether Ebberts' transfers were supported by a legally sufficient consideration. Ebberts' transfers of oil and gas leaseholds were in effect conveyances of land, that is, deeds, and no consideration is ordinarily required to make them valid conveyances. See: Kauffman v. Deignan, Tex.Civ.App., 227 S.W.2d 271, at page 275 (Hn. 9). Ebberts and Mrs. Ebberts did require a substantial consideration from defendant; but all of Mrs. Ebberts' was paid to her and a very substantial part of Ebberts' was paid to him. So far as Ebberts is concerned only a partial failure of consideration can have occurred.

There is no ambiguity in the oil payment reservations which would authorize parol proof of a promise to recondition the non-producing wells, if such proof be not otherwise admissible.

The subject matter of Point 14, namely, that the failure to attempt to recondition the well on lot 9 was so material a partial failure of consideration that the trial court should have rescinded the various transfers to defendant, is determined hereinafter by the comments adjudicating Point 15.

The plaintiffs have argued under this group of points that the Hebert lease of 1940 actually expired because of abandonment. This contention is discussed hereinafter under Point 34 et seq.

Point 15 assigns as error that cancellation is the only remedy available to plaintiffs, under the facts, and Point 16, that since intervenors want it judicially declared that the Hebert lease of 1940 has terminated because the defendant abandoned this lease, cancellation is also the only remedy available to them.

It is unnecessary to discuss Point 16. Doubtless if the Hebert lease of 1940 had terminated, the intervenors are entitled to a judgment against the defendant so declaring. However, we hold under a subsequent point that the lease was not proved expired.

Point 15 and the argument thereunder concern the promise to recondition the wells which the plaintiffs charge against the defendant. This argument may be summarized as follows: (a) Specific performance is not available to enforce this promise because the wells in which the oil payments were reserved have been destroyed. This element of the argument, of course, is established because it was proved as a matter of law that the defendant had destroyed the wells by pulling the casing out of the ground. Carpenter said that this happened in 1947 but Ebberts thought that it had happened in 1948. (b) Damages for breach of the promise is not an adequate remedy (rather, no remedy at all) because it cannot be shown whether the wells in which the oil payments were reserved could have been reconditioned so that oil would flow out of them, and it cannot be shown whether any, or how much, oil could have been produced from these wells had they been reconditioned. (c) Thus, say the plaintiffs, they are remitted to the remedy of cancellation if they are to have any relief at all.

The first comment to be made on this argument about the inadequacy of damages as a remedy is that the argument must be proved by evidence. Plaintiffs seem to argue to the contrary, but we can not assume, without evidence supporting the inference that any element of this argument is true in fact. For the argument to be entitled to consideration there must be evidence showing that it is impossible to determine whether the wells could be reconditioned, whether oil would be available to these wells, or whether the probable output of these wells, if reconditioned, could be calculated.

Second, it actually was a question of fact whether the well on lot 9 could have been reconditioned. For instance, Ebberts himself testified:

"Q. Now, the reason that the production stopped on 9, I believe was the one that the tubes were stuck in? A. Yes, sir.

"Q. Was there any reason that you knew of at that time why, under proper work-over operations, that the production could not have been restored? A. Yes, it could have been restored.

"Q. If the well had been worked over, based on your experience as an operator in that field for a long time, would you normally expect the well to come in at a greater or less or the same production? A. About the same. * * *

"Q. And ask him this question: Was there anything at the time that you stopped the production on 9 to indicate that the well would not produce again? A. No, sir." The oil payment reserved in the well supposed to be on lot 18 has failed and is not material at this point; but there was a conflict between Ebberts and Carpenter as to what the defendant did in attempting to recondition this well and it was probably a question of fact, whether this well could have been reconditioned. At least, the evidence does not show as a matter of law either that the well could not have been reconditioned or that it was impossible to determine whether this well could have been reconditioned or not.

The history of these wells, as related by Ebberts, tends to prove that oil was available to both of the non-producing wells; and we have just quoted an opinion by Ebberts that the well on lot 9, after reconditioning, would produce as it had been. We think that this too was a question of fact. Certainly it was not proved as a matter of law that it could not be shown whether oil was or was not available.

This leaves only the question, what amount of oil could be produced from the well on lot 9? For as we have stated, the reservation in lot 18 failed. There actually was some evidence here. It is set out in our supplementary findings and will not be repeated. Taking into consideration the age of the well, the average period of productivity of wells in this field, the record of production from this well, the other information about the field which references to numerous wells on and about the property, in the past and in the present, indicate to be available, and the known fact that from proper geophysical information an expert can determine the amount of oil under

a particular tract, we have to say that the evidence probably raises an issue as to the total amount of oil recoverable from the well on lot 9, but that if the evidence does not go so far, it does *prove* that plaintiffs have not showed that they cannot prove what this production would be.

It seems to us that plaintiffs have simply failed to establish the inadequacy of damages as a remedy.

Third, if the various questions of fact pointed out above were all resolved in the plaintiffs' favor this still would not end the matter. The question nevertheless remains how are the rights of the plaintiffs affected?

Since the plaintiffs have admitted that the well supposed to be on lot 18 is actually on lot 17, in which the defendant acquired no interest and about which Carpenter and Ebberts had no negotiations or discussion, the oil payment reserved in this well failed and need not be further discussed at this point. However, there was no mistake about the location of the well on lot 9 and the oil payment reserved in this well did not fail.

■ We have held under Points 8 to 14, inclusive, that the promise, if any, to be implied from the terms of the oil payment reservation in the bill of sale would be a promise to make the oil payments; and this promise, being one to pay out of production from certain specific, designated wells, is a conditional promise, the conditions being the availability of oil to the designated wells and the restoration of these wells to a state which would allow oil to be taken out of them. This promise, unless discharged in some other way, would necessarily include promises to recondition the wells and to keep the Hebert lease of 1940 in force until the oil payments were made or the available supply of oil was exhausted.

The promise which the plaintiffs invoke is not materially different in any respect important at this point. The promise claimed by the plaintiffs is an unconditional promise by the defendant to attempt to recondition the wells in which the oil payments were reserved. We have construed the proof concerning this promise as showing that this promise was made to Ebberts

and that its object was to procure the oil with which to make the oil payments, but defendant's liability on it for these payments was conditional in the same sense and to the same extent as the implied promise to make the oil payments would have been.

Of the conditions mentioned, one, the reconditioning of the wells, depended on the defendant's own acts, and the other, availability of oil, would have been demonstrated or not when the defendant had reconditioned the wells. But the defendant, by its own act, has made it impossible for these conditions to occur. This act of the defendant was the pulling of the pipe from the wells and the consequent construction of the wells. If we are to assume, then, that fact findings would have shown it impossible to prove whether one or more of these conditions could have been performed this impossibility was caused by defendant's own act.

■ The general rule concerning liability on conditional promises is stated as follows in Ferguson v. Mansfield, 114 Tex. 112, 263 S.W. 894, at page 900: "It is quite elementary that an instrument payable upon a condition which does not import an absolute liability is not payable until that condition has happened."

This general rule has been applied to promises to pay money out of oil produced. (a) Bonus for a lease: Sheppard v. Stanolind Oil & Gas Co., Tex.Civ.App., 125 S.W. 2d 643, at page 647 (Hn. 1); (b) bonus to lessor, after operating expense paid: Leonard v. Prater, Tex.Com.App., 36 S.W.2d 216, 86 A.L.R. 499; (c) part of the purchase price of land: Ferris v. Huffman, Tex.Com.App., 274 S.W. 125; (d) part of the consideration for an assignment of an oil and gas lease: Harris v. Wheeler, Tex. Com.App., 267 S.W. 465.

■ Normally, then, the promisee must prove that the condition has happened in order to recover money conditionally promised. Harris v. Wheeler, Tex. Com.App., 267 S.W. 465, at page 466. Or, if the happening of the condition depended upon the promisor's performance and the promisor has refused to perform, the

618

promisee normally must prove that the condition would have happened if the promisor had done what he agreed to do. Logan v. Elliott, Tex.Civ.App., 61 S.W.2d 157; Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.2d 1031, at page 1034 (Hn. 2), 60 A.L.R. 936.

However, the rules last stated need not be applied where the promisor's own act makes it impossible for the condition to occur, on which his promise depended. In such cases it has often been held that the particular condition was, in effect, discharged and that the promisor had become absolutely bound to give the promised performance. Thus, it was said in Harris v. Wheeler, Tex.Com.App., 267 S.W. 465, at page 466: "If the payment by lessee of any sum other than the cash and note depended on the oil produced on the lease, then before lessors could recover such sum it would be necessary for them to allege and prove the production, *or that production was prevented by lessee * * *.*" And see: Marvin v. Rogers, 53 Tex.Civ.App. 423, 115 S.W. 863; Johnson v. Sharp, 56 Tex. Civ.App. 80, 120 S.W. 518; J. M. Huber Petroleum Co. v. Quillin, Tex.Civ.App., 60 S.W.2d 261; Reagan County Purchasing Co. v. Big Lake Oil Co., Tex.Civ.App., 105 S.W.2d 462; Courreges v. System Freight Service, Inc., Tex.Civ.App., 152 S.W.2d 841. And see: Wolf v. Marsh, 54 Cal. 228; Poirier v. Gravel, 88 Cal. 79, 25 P. 962; Carter v. Rhodes, 135 Cal. 46, 66 P. 985; Dill v. Pope, 29 Kan. 289; Cape Fear & Deep River Nav. Co. v. Wilcox, 52 N.C. 481. And for analogous results, see: Miller v. Hodges, Tex.Com.App., 260 S.W. 168, at page 172; Sanderson v. Sanderson, 130 Tex. 264, 109 S.W.2d 744; Jones v. Gibbs, 113 Tex. 627, 130 S.W.2d 265, 131 2d 957; Huggins v. Robison, 118 Tex. 82, 10 S.W.2d 710. The Circuit Court of Appeals has indicated that a promisor's negligence which prevented the occurrence of a condition would have the same consequence as the promisor's willful conduct. United Central Oil Corp. v. Helm, 5 Cir., 11 F.2d 760.

Discharge of the condition (at least in effect) by the promisor's act making the occurrence of the condition impossible has been placed on the ground of waiver. Thus the Court of Appeals said in Amies v. Wesnofske, 255 N.Y. 156, 174 N.E. 436, at page 438, 73 A.L.R. 918: "The doctrine is purely one of waiver; active conduct of the conditional promisor, preventing or hindering the fulfillment of the condition, eliminates it and makes the promise absolute." In Dill v. Pope, 29 Kan. 289, at page 290, the Court used the word "estoppel". The promise was to pay a part of the purchase price of an interest in a mine out of minerals to be taken from the mine. The promisor sold this interest and produced no minerals. Said the court: "By selling the interest he had purchased, he, holding no other interest in the mine, and having no control or right to work it, disabled himself from ever complying with this condition. The moment he did this, his conditional liability on the contract for the unpaid purchase money became absolute, and said purchase money became presently due. This is upon the well settled principle that a party to a contract, who by his own act prevents the happening of a condition, is estopped thereafter to say that such condition has not happened. No party to a contract can interfere to prevent the performance of any condition, and then claim any benefit or escape any liability from the failure of such performance." This holding was applied and followed by the Circuit Court of Appeals in Collins v. Atlantic Oil Producing Co., 5 Cir., 74 F.2d 122. Mr. Williston makes the following statement: (Sec. 677, 2nd Ed.) "It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he can not take advantage of the failure."

The situation before us is fundamentally like the cases cited. The defendant destroyed the wells, and did this for a purpose having to do with its own benefit. That is, to procure the pipe in the wells. There is no proof that defendant did this to prevent the occurrence of any obligation to make the oil payments. Indeed, the evidence (Carpenter's testimony) is to the contrary. Carpenter said, in effect, that the destruction of the wells was a mistake, that

he had given instructions to a subordinate employee to pull the pipe from dead wells because of a shortage of pipe in the market. The employee knew nothing about the transaction between the defendant and plaintiffs and no one told him *not* to pull the pipe from the wells in which the oil payments had been reserved and he pulled the pipe from these wells in accordance with instructions given him. This act, whether negligent or more than negligent, is of the same sort as that considered in cases cited above and it ought to have the same consequence upon the rights of the parties which it affected. It certainly had the same result so far as creating an impossibility is concerned.

Further, on the assumption we are considering, namely, a finding that it could not be determined whether the various conditions on which the promise depended could have been performed, defendant's act made it impossible for the plaintiffs to prove just what damages they had suffered. For the same reason that the defendant would not be allowed to insist on the happening of these conditions, namely, justice between the parties, it seems to us that defendant also ought not to be allowed to insist on the plaintiffs furnishing proof of which the defendant's own act had deprived them.

The Supreme Court has made an analogous holding in Park v. Swartz, 110 Tex. 564, 222 S.W. 156. There the plaintiff was an agent for the sale of defendants' lots and the defendants prevented his performance by selling the lots themselves. It was held that on proof of these facts the plaintiff was entitled to recover the maximum amount of the commission which he could have earned unless the defendants proved that he would not have earned this sum. This holding concerns the burden of proof; but if it be a proper rule when rebutting proof may be available it ought also to be the rule when the defendant has made it impossible to furnish the rebutting proof.

There was a breach of contract if there was a conditional implied promise to make the oil payments or if there was the unconditional promise to recondition the wells to which Ebberts testified. Incidental to

such promises would be an implied promise not to prevent the happening of conditions on which the promise depended and not to prevent the performance of the promise; and since the destruction of the wells resulted in the total destruction of the subject matter of these promises and of the value of these promises, the promisee Ebberts was entitled to recover the full value of these promises as damages. This would be the maximum amount of the oil payment on lot 9 if the destruction of the wells actually made it impossible for the plaintiffs to show whether the various conditions on which the promises depended would have occurred if the defendant had done as agreed. Concerning implied promises not to prevent performance or the happening of conditions, see: Williston's 2nd Edition, Sec. 1293a and Sec. 1318.

Thus, if it were to be proved that no one could now say whether the wells in which the oil payments were reserved could have been reconditioned and if so, whether any oil could have been produced through them and if so, how much oil, the promisee Ebberts would be entitled to recover the entire amount of the oil payment in lot 9, that is $5000.00.

Our conclusion is that plaintiffs' remedy in damages is adequate, and we see no reason why the ordinary rule should not be applied, which denies rescission of a conveyance because a covenant has been breached. See: Paris Grocer Co. v. Burks, 101 Tex. 106, 105 S.W. 174; Moore v. Cross, 87 Tex. 557, 29 S.W. 1051; Meyer v. Swift, 73 Tex. 367, 369, 11 S.W. 378; Chicago, T. & M. C. Ry. Co. v. Titterington, 84 Tex. 218, 223, 19 S.W. 472; Panhandle Refining Co. v. Swope, Tex.Civ. App., 241 S.W. 597; Bryson v. Fuller, Tex. Civ.App., 279 S.W. 488; Tripplehorn v. Ladd-Hannon Oil Corp., Tex.Civ.App., 8 S.W.2d 217, writ dismissed for want of jurisdiction, 118 Tex. 195, 13 S.W.2d 666; Mon-Tex Corp. v. Poteet, 118 Tex. 546, 19 S.W.2d 32; W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27.

Point 17 assigns as error that defendant's admitted failure to attempt the reconditioning of the well of lot 9 prior to the

destruction of this well was so material a partial breach of contract as to justify rescission.

This point has been disposed of by the concluding remarks in our discussion of Point 15. Defendant admittedly never tried to recondition the well on lot 9, but the remedy in damages for the breach of contract occurring when the defendant destroyed the well is an adequate remedy for the failure to recondition the well on lot 9, if there was a promise so to do.

Point 18 assigns as error that there was evidence that defendant "fraudulently made a bad faith effort to recondition the well described (in the bill of sale) as being located on lot 18—to deceive plaintiffs" and that this, with the admitted failure to attempt the reconditioning of the well on lot 9, raised the issue for the jury whether defendant had totally breached "said contract—in respect to the reconditioning of said wells."

The defendant did some work on the well supposed to be on lot 18. Carpenter testified, in effect, that defendant did what Ebberts said would be necessary to restore the well to productivity. Ebberts' testimony tends to show that the defendant did much less than Carpenter testified to. However, it is admitted by the plaintiffs, as between themselves and the defendant, that the well supposed to be on lot 18 actually was on lot 17. Plaintiffs did not undertake to sell and defendant did not undertake to buy any interest in a lot 17, and defendant acquired no title to that lot or to the well on that lot. Consequently, it is immaterial whether the defendant did what Carpenter testified to, or did only what Ebberts testified to, or whether the defendant attempted in good faith to recondition the well on this lot, because the defendant was under no obligation to do anything. Carpenter and Ebberts mistook the location of this well; this mistake concerned the subject matter of the contract and not merely the expression of the contract; and when Carpenter discovered the mistake, he was entitled to stop the work on this well. We have mentioned the fact that plaintiffs had no title to lot 17 unless they had acquired one by adverse possession. Plaintiffs claim that they proved a title by adverse possession but we have held otherwise under Points 54 and 58. Regardless of this latter holding the defendant had no opportunity of deciding whether a limitation title would be acceptable.

Point 19 assigns error to the exclusion of Ebberts' testimony showing what expenditure a good faith effort to recondition the well on lot 9 and the well represented to be on lot 18 would have amounted to, and Point 20 assigns error to the exclusion of Ebberts' testimony about a statement to him by an employee of defendant's, explaining why the attempt to recondition the well represented to be on lot 18 was stopped. The excluded testimony referred to in Points 19 and 20 which concerns the well supposed to be on lot 18 but actually on lot 17 (as between plaintiffs and defendant) was immaterial for reasons stated in our discussion of Point 18. Defendant acquired no interest in this well and was under no obligation to recondition it.

Our holdings under Points 15 and 17 have also necessarily made immaterial the excluded testimony about the cost of reconditioning the well on lot 9.

Point 21 and Points 23 to 26, inclusive, assign as error matters involved in or pertaining to another ground for the rescission of the sale to the defendant. This ground is fraud, of which one aspect was alleged in the petition and another was alleged in a trial amendment of the petition which the trial court denied leave to file. The fraud alleged in the petition was this, that the obligation to rework the dead wells on the Hebert leasehold was made by the defendant with the intention not to perform it. The fraud alleged in the trial amendment was, that Carpenter promised Ebberts to draft the contract documents so as to put the obligation to rework these dead wells on the defendant and that he told Ebberts he had done so before Ebberts took these documents away with him for signature.

Adjudication of these points requires a restatement of some matters already stated.

Ebberts testified, in effect, that Carpenter told him during their negotiations that de-

fendant would rework the wells; that he relied on this promise in deciding to sell, and that if the promise had not been made he would not have executed the various transfers and would not have permitted his wife to do so.

Carpenter said that defendant was under no obligation to rework these wells, that the various documents of sale correctly stated his agreement with Ebberts, and that he drafted these papers so as to exclude any obligation to do any work on these wells. Carpenter said that he had intended from the beginning to rework the dead wells, and some work was actually done by the defendant on the well which was represented to be on lot 18. According to Carpenter this was done in August, 1944. According to Ebberts, it was done in the late spring or early summer of 1945. According to Carpenter's testimony on trial, this work was delayed because the defendant was waiting on equipment; but on his pre-trial deposition he had given another reason as well as this. According to Carpenter, the work done was what Ebberts had told him, at the time of the negotiations, was needed; it extended over a period of several days; and it cost a substantial sum, both in money and in assistance rendered the contractor by the defendant. According to Ebberts the work was begun one day and was abandoned on the next day.

Carpenter said that the work done on this well did not restore it to profitable production. He said that immediately after this became evident, in September, 1944, he was informed by his production superintendent while discussing this situation that the well was not on lot 18 but was on lot 17, and that this was the first he knew of the mistake concerning the location of this well and of the producing well represented to be on lot 19 but actually on lot 18. The employee who gave this information to Carpenter seems always to have known the facts concerning the location of these wells but Carpenter supposed that the employee did not tell him these facts because the employee was a person who did not volunteer information but waited until a question was asked of him.

Ebberts was not told of this discovery until the suit was filed. Carpenter said that he had no occasion to tell Ebberts and expressed the opinion that Ebberts knew the facts when negotiating the sale. For this there was some supporting circumstantial evidence in documents filed by Ebberts with the railroad commission. Ebberts at first denied that the well which he had said was on lot 18 was instead on lot 17 and that the well represented to be on lot 19 was on lot 18, but after the production of the documentary evidence which we have just mentioned, the plaintiffs admitted that these were the facts but disclaimed knowledge of this when negotiating with Carpenter.

Carpenter said that no work had ever been done on the well on lot 9 and gave as his reason some statements made to him that the well, because of acts done by Ebberts' employees, was in a condition which made restoration of the well impossible. The testimony would be hearsay if regarded as proof of the actual condition of the well, but on the issue of fraud, it tended to show Carpenter's intention, and Carpenter throughout the case was treated by all parties as the alter ego of the defendant corporation. Carpenter, however, seems never to have discussed this information with Ebberts, and Ebberts denied that the wells were in such condition. On the contrary, he expressed the opinion that the well could have been restored with little effort.

 Ebberts testified, in effect, that the reconditioning of both dead wells should have been relatively simple and inexpensive but that if the work he had in mind proved to be ineffective, then the next step would have been "side tracking". This procedure simply involved the drilling of another oil well beside the non-producing well, but it made use of the upper part of the non-producing well. Obviously it was not a reworking of the old well.

In 1947, according to Carpenter, and in 1948, according to Ebberts, the dead wells were destroyed by an employee of the defendant's, acting under instructions given him by Carpenter. Carpenter, however, explained this as a mistake; in order to ob-

tain the pipe in non-producing wells this employee was told to pull the pipe from these wells and was not told to leave the pipe in the dead wells on the Hebert leasehold. There was a reason for defendant's leaving the pipe in the well on lot 17 (represented to be on lot 18) since defendant had no title to that lot, and Carpenter referred to this as a reason why the defendant should not have destroyed this well. However, it is not apparent under Carpenter's theory of the facts why the defendant should not have dealt with the well on lot 9 as the defendant wished, and the only reason he gave pertaining to lot 9 was that the operation would not have been profitable. Carpenter said at first that he would not have allowed the casing to be pulled from either well "Because I thought it would not be proper to pull it under the circumstances." The circumstances suggest the belief that some sort of an obligation concerning these wells, or concerning the well on lot 9, was in existence.

The defendant has operated the producing well continuously since taking possession of it, and before this controversy arose royalties were consistently and regularly paid from this well, one-half to Mrs. Ebberts (or to her and her husband) and one-half to intervenors.

No part of the oil payments reserved in the two dead wells on the Hebert leasehold has ever been paid.

Plaintiffs have referred to other circumstances in their proof, but we think that if plaintiffs proved a fraudulent intent on the part of the defendant not to perform a promise, it was by virtue of the evidence which we have just summarized.

Plaintiffs proffered their trial amendment during the course of the trial, after Carpenter had testified that he drafted the contract documents so as to exclude any obligation to make the oil payments and after the trial court had sustained objection to a question addressed to Ebberts by plaintiffs' counsel, whether Carpenter had represented to him that in legal effect a particular instrument (presumably the bill of sale) imposed an obligation on defendant to rework the dead wells. The objec-

tion was, lack of pleading and the parol evidence rule. Leave to file paragraphs 1 and 2 of the trial amendment was denied but leave was granted to file paragraph 3 and no question is made concerning this paragraph. After the sustaining of the objection mentioned, and after the trial court had denied leave to file the trial amendment, plaintiffs offered testimony by Ebberts that Carpenter told him that in drafting "this instrument" (we assume that counsel referred to the bill of sale) he, Carpenter, intended to put the obligation on defendant to rework the wells, that he, Carpenter, had done so, that Carpenter told him this before he, that is, Ebberts, signed the instrument, that he, Ebberts, relied on these representations, and that he would not have signed the instruments of transfer nor have permitted Mrs. Ebberts to sign them if he had known that Carpenter did not intend to impose this liability. All of this evidence was excluded.

Plaintiffs proffered their trial amendment again, at a time when the trial court had excused the jury for 10 days but this motion was also denied.

Point 21 assigns error to the trial court's denial of leave to file the trial amendment. Point 25 assigns error to the exclusion of the testimony of Ebberts which we have referred to above. We agree with defendant that plaintiffs showed no diligence in tendering paragraph 1 of the trial amendment; this is the paragraph in which fraudulent misrepresentation of the legal effect of the contract documents was alleged. The case had been on file a little more than a year. Ebberts necessarily knew the facts and the matter of fraud in connection with the promise claimed by him had been directed to his attention; he had plead fraud in obtaining the plaintiffs' property by means of the promise which, he now offered to prove, Carpenter had told him was in the papers he signed, and in his petition he had alleged that this promise actually was in these papers. There is nothing in the defendant's answer which indicates that the defendant agreed to having made such a promise or to having put it in the contract documents. Instead, the defendant filed a general de-

nial, which put the plaintiffs on proof of the promise they claim and on proof of the fact that this promise was in the sale documents. Plaintiffs say that Carpenter also knew the facts and thus that defendant could not have been surprised by the trial amendment; but this argument presupposes that Carpenter agreed with Ebberts, and as we have shown, he took a different position. He denied this, and since paragraph 1 of the trial amendment involves charges that he misrepresented to Ebberts the legal effect of the contract documents it is inconsistent with plaintiffs' petition because it presupposes that the promise is not in the contract papers while the petition alleges that the promise is in those papers. Paragraph 1 of the trial amendment simply added a new ground of fraud, of which the defendant would ordinarily have been entitled to as much notice as defendant was entitled to have concerning the plaintiffs' other grounds of rescission if the plaintiffs wanted to use this ground as a distinct ground of recovery. However, it may be said on the other hand that the excluded testimony of Ebberts was in flat conflict with that of Carpenter and not only impeached Carpenter; it also tended to prove that the parol promise to which Ebberts testified was made with the intention not to perform it, and this, of course, was a material element of the ground of fraud which the petition alleged. But in this aspect the excluded testimony would not have been an independent ground of recovery.

The admissibility of this excluded testimony of Ebberts as circumstantial proof of a fraudulent intent necessarily bears on the question, what notice of a pleading alleging this evidence the defendant was entitled to receive; and another relevant matter is the fact that the excluded parts of the trial amendment were again offered for filing at a time when the trial of the cause was suspended for a future period of ten days.

█ We are not certain that under the circumstances leave to file paragraph 1 of the trial amendment was rightly denied for any reason not going to the merits of the grounds of fraud alleged; but we have concluded that if error there was in denying leave to file, this and any error in excluding the particular testimony of Ebberts' were harmless because the trial court rightly denied the plaintiffs a rescission on the ground of fraud for reasons hereinafter stated in our discussion of Points 23 and 24.

█ We have not discussed paragraph 2 of the trial amendment, but defendant says that the basic facts presented (as distinguished from conclusions) are in proof, as indeed they are; and defendant's admission obviates any possible error in the exclusion of this paragraph of the trial amendment.

Point 21 is therefore overruled.

Point 25 is also overruled. The evidence was rightly excluded so far as it was proof of an independent ground of fraud because in this aspect it was not supported by pleading. The action of the trial court which controls this phase of Point 25 is the refusal of leave to file the trial amendment which, correct or incorrect, required the exclusion of this testimony when the defendant objected. We think that if the fraudulent parol promise alleged in the petition was admissible in proof, then the excluded testimony of Ebberts' was also admissible under the petition on file as circumstantial evidence that the promise was made with the intention not to perform it; but since we have concluded that no relief can be awarded plaintiffs on this ground of fraud, that is, the ground alleged in the petition, the exclusion of this testimony of Ebberts was immaterial. Necessarily, a representation that the contract documents contained a promise which affords the plaintiffs no ground for rescission is immaterial if the promise itself is.

█ Point 26 assigns error to the exclusion of certain testimony by Ebberts concerning Carpenter's promise to rework the dead wells on the Hebert leasehold, and concerning the materiality of this promise to the plaintiffs. Some of this testimony was once excluded but it was later admit-

ted and the substance of all of the evidence referred to in Point 26 is in proof and for that reason Point 26 is overruled.

Points 23 and 24 raise the question, whether the evidence actually admitted was proof of a cause of action for rescission because of the fraud alleged in the petition, which should have been submitted to the jury. The fraud alleged, as we have stated, was the intention of defendant never to perform that promise to rework the wells which Ebberts says was made to him by Carpenter. It is assigned in Point 23 that the trial court should have submitted "appropriate issues of fraud to the jury to determine whether the promise of defendant to make a bona fide effort—to recondition (the dead wells) was supplied by—implication of law from the—language employed in (the sale papers) or whether said promise was made by the defendant in the form of a contemporaneous parol agreement" because there was evidence that defendant entered into the contract with plaintiffs intending not to perform "such promise and obligation," that "said promise was made by the defendant to the plaintiff —Ebberts—for the express purpose of cheating and defrauding" plaintiffs of their property, and that plaintiffs relied on this promise, were induced thereby to make the contract with defendant, and would not have made this contract except for this promise.

Point 24 repeats some elements of Point 23 and adds only a statement, in effect, that there was evidence that defendant, through Carpenter, had promised to prepare the sale papers so as to obligate defendant to rework the dead wells. This evidence was excluded, not admitted, and the adjudication of Point 23 will therefore adjudicate the remainder of the subject matter of Point 24.

We are inclined to think that under the decision of the Commission of Appeals in Tatum v. Orange & Northwestern Ry Co., 245 S.W. 231, the circumstances summarized at the beginning of the discussion of this group of points made it an issue of fact, whether Carpenter told Ebberts during their negotiations that defendant would rework the dead wells, intending, however, not to perform this promise, and whether the promise was relied on by Ebberts (and thus, by Mrs. Ebberts) and was a cause of the plaintiffs' sale of their property to the defendant. For the opinions of this court in the Tatum case, see: 198 S.W. 348 and 261 S.W. 421. There is more in proof than a simple denial by Carpenter of having made the promise testified to by Ebberts. The most significant element of Carpenter's testimony was his statement that he drafted the sale papers so as to exclude any absolute obligation to rework the dead wells, and defendant says, in effect, that this statement was only a part of Carpenter's description of the contract of sale, namely, that the oil payments were conditional and that defendant had the option of reworking the wells or not as the defendant willed, and that this particular element of Carpenter's description of the contract can not justly be separated from the rest of that description. The argument is cogent but it seems inconsistent with the language of the Commission of Appeals. The Tatum case was a suit for damages for personal injuries, brought by a former employee of a railway company, and it involved the claim by the plaintiff that a release which he had given to the defendant was procured by a fraudulent promise to give him employment. Gaston was one of the officials with whom he talked and the Commission said [245 S.W. 232] "It does not follow that, because Gaston denied that he made the verbal agreement, his testimony, that he had no intention of giving plaintiff the position, is necessarily to be disregarded."

But whether the issue of fraudulent intention not to rework the dead wells is material is a different matter, and we have concluded that it is not, for reasons now to be stated.

Several possibilities must be discussed because we have assumed, without making any decision, that an obligation was to be charged upon defendant by implication from the bill of sale. It is material to the discussion of this possible implication that the plaintiffs, according to the proof, read over the contract documents at their leisure in Beaumont, out of Carpenter's presence

and with such opportunity for reflection as they wished, and that nothing is in proof showing that they misunderstood what they signed. They even procured of Carpenter a material change in Mrs. Ebberts' deed to the defendant. Of course, the excluded testimony of Ebberts does show that plaintiffs misunderstood these papers, but this testimony cannot be given any consideration on the questions now discussed; it is only material as it bears on the question, whether the exclusion of the trial amendment is reversible error.

■ Fraudulent intention is a state of mind. Under the circumstances of this case, the defendant cannot be charged with a fraudulent intention never to perform a promise to rework the dead wells unless Carpenter knew that he had made the promise. Thus if the obligation possibly to be implied from the bill of sale be wholly implied in law and not at all in fact, this implication would have been made without regard to Carpenter's or defendant's will and there could be no intention regarding its performance unless at least Carpenter realized that this implication was a part of the contract. Such a case probably would show a promise in fact, as distinguished from a promise wholly implied in law, but there is no evidence of the purely legal promise we have supposed and the plaintiffs really do not claim it. They claim an express promise made to Ebberts by Carpenter, either included in the contract or, in the trial amendment, fraudulently omitted from the contract, and they do not claim any implication otherwise.

■ If an obligation be implied in fact from the terms of the bill of sale, including the sense just mentioned, then the terms of that promise are material to the question of fraud. We have held in our discussion of Points 8 to 14 that if an obligation was charged upon defendant by implication from the bill of sale, it was a conditional promise to pay money which defendant might have discharged by paying the total sum of the oil payments without doing any work on the wells in which the payments were reserved. The absolute obligation to rework these wells which plaintiffs claim,

is inconsistent with such a promise, and an intention never to rework the wells would seem to be only a circumstance bearing on the question, whether the defendant intended never to pay the money represented by the oil payments. Of course, this implied promise is not claimed by the plaintiffs; they claim, instead, an absolute obligation to rework the dead wells which would produce royalties as well as oil payments.

Fraudulent intention not to perform the only promise which might be charged upon defendant by implication from the bill of sale thus was not proved because the plaintiffs claim a different kind of promise. The implied obligation which we have stated is inconsistent with and would disprove the obligation which plaintiffs alleged.

■ However, the implied promise we have stated has another consequence. To repeat, the plaintiffs' theory of the facts is this, an absolute promise to rework the dead wells, first expressed orally to Ebberts by Carpenter and then either written into the contract by Carpenter or else fraudulently omitted by him, the plaintiffs, however, believing in either event that the promise was there. The plaintiffs, then, emphatically do not claim that they signed the contract document under the impression that these papers put no obligation on defendant to rework the wells; they claim to have signed the papers under exactly the opposite impression. As we have stated, the petition and the proof do not trace this impression of the plaintiffs' to the defendant's construction of the contract documents; this impression represents, on the pleading and the proof, something the plaintiffs themselves are responsible for. We have mentioned the facts that plaintiffs considered the contract document privately and at their leisure and actually caused Carpenter to amend one of these documents. This being the case, the plaintiffs, acting on their own responsibility, would have signed a contract which raised an implied promise inconsistent with the prior parol promise; and we see no reason why the parol evidence rule should not be applied to the proof of this parol promise. See: Distributors Inv. Co. v. Patton, 130 Tex. 449,

110 S.W.2d 47; Super-Cold Southwest Co. v. Elkins, 140 Tex. 48, 166 S.W.2d 97.

■ These comments concern only the fraud alleged in the petition and the evidence which is actually in proof. It remains to consider the possibility that the contract documents imply no obligation and are not a complete memorial of the agreement. This, of course, is inconsistent with the theory of fraud alleged in the petition. However, it is involved in the excluded trial amendment and affords a prime reason why that amendment might be thought material. Nevertheless the plaintiffs were not entitled to rescind their sale to the defendant for these reasons: First, the legal remedy of the defendant to recover the oil payment was adequate; we have so held in our discussion of Point 15. The oil payment reserved in the well supposed to be on lot 18 failed but that in the well on lot 9 did not fail. As we construe the contract, this payment of $5,000 is the maximum amount of the unpaid consideration for the sale to defendant. Under plaintiffs' theory possible royalties from this well were also a part of this consideration but the circumstances indicate that the remedy at law is also adequate here for reasons stated in our discussion of Point 15. Plaintiffs at least have not proved the remedy inadequate.

■ Second, a comparison of rescission with the plaintiffs' legal remedy for the recovery of the oil payment in lot 9 or the royalties in that well shows that rescission would be unjust. (a) The defendant performed the unconditional part of the consideration, and in doing so paid plaintiffs $13,300 in cash. The remainder of the consideration is conditional even under plaintiffs' theory of the contract, the difference between plaintiffs and defendant being whether one of the conditions was defendant's will to rework the wells. Plaintiffs agree that defendant's liability to pay royalties and the oil payment is conditioned on the availability of oil to the well on lot 9 and the restoration of that well to a condition allowing oil to flow through the well. Performance of all conditions, disputed and admitted, would nevertheless have extended the actual payment of any sum due plaintiffs over a long period of time. (b) The sum conditionally due plaintiffs and payable over a period is less than the sum paid plaintiffs in 1943. The maximum sum due plaintiffs under our construction of the contract is the oil payment reserved in the well on lot 9, amounting to $5,000. Under plaintiffs' theory of the contract, plaintiffs would also be entitled to a one-sixteenth royalty in the production from this well if it were restored, and the evidence very strongly indicates that the maximum amount of this royalty would not exceed $7,000; so that even under plaintiffs' view, the defendant has paid more than one-half of the price of the property. We discount the speculative possibility of royalties under other wells which might be drilled; none have been and no plan to drill any was proved. (c) A rescission very probably would subject defendant to liability in damages much greater than the liability chargeable against defendant at law. Thus, defendant has had possession of Mrs. Ebberts' property since 1943. Plaintiffs did not prove this value but alleged it to be $3,000. This value was at least an item of some consequence. Further, were a rescission granted, the plaintiffs would be entitled to compensation for the property which the defendant could not return. Ebberts transferred a considerable amount of oil field equipment to the defendant in December, 1943. The plaintiffs alleged that this property could not be returned to them, having been lost or destroyed. It was certainly more than 7 years older when this case was tried and must have been considerably reduced in value during this period. Plaintiffs alleged that this property was worth $15,000 at the time of the sale, and after excluding other values, Ebberts testified that it was worth $15,000 to him at that time. This testimony was later stricken. Plaintiffs alleged (Tr. 24, paragraph 22) that the Hebert lease was worth $125,000 if the dead wells were on lots 18 and 9 and (Tr. 30 and 31, paragraph 29) was worth $85,000 with only the well on lot 9. They also alleged that Mrs. Ebberts' one-third interest in lots 11 to 16, inclusive, had been encumbered without plaintiffs' consent with the defendant's lease to Newton who, being

a bona fide purchaser, had title against the plaintiffs, and that Mrs. Ebberts' one-third interest was worth $50,000. Ebberts offered to testify, and this testimony was excluded, that these items had no value except to him, or to plaintiffs, and that these values were: (1) $100,000 for the leasehold if the dead wells were on lots 18 and 9 and $70,000 if only the well on lot 9 was on this leasehold; (2) $35,000 for a one-third interest in lots 11 to 16, inclusive. This proof was subject to contradiction and in all reasonable probability to reduction, but defendant's liability to pay these damages would be unconditional and immediate (instead of conditional and over time, as under the promise claimed by plaintiffs) and probably would be substantial. These figures represent at least the plaintiffs' theory of the facts. Plaintiffs certainly have lost most of Mrs. Ebberts' one-third interest in lots 11 to 16, inclusive, and of Newton's two wells on lot 16, one produced oil for awhile. Further, the defendant has operated the producing well, thought originally to be on lot 19, and the tables at S.F. 568 and 572, which show the production ending with March, 1950, show that defendant had been paid $32,521.13 for the oil from this well. Doubtless on an accounting the defendant would be entitled to credit for the $13,300 in cash which the defendant paid at the beginning of the transaction as well as to other credits against the proceeds of the oil, for expenses in operating the producing well and for other matters, and the sum total of all of these credits cannot be calculated here. However, it is not suggested by the plaintiffs that these credits equal or exceed the proceeds of the oil. Further, we note that the plaintiffs alleged (Tr. 131–132), although no proof of the allegation was made, that after the defendant destroyed the dead wells (and this was done in 1947 or 1948) the Hebert leasehold of 1940, which, incidentally adjoins the lots leased to Newton had become much more valuable because of production of oil elsewhere. This allegation also represents plaintiffs' theory of the facts and is a circumstance indicating both the present value of the Hebert leasehold and the present value of Newton's leasehold in lots 11 to 16, inclusive.

We have taken no account of the casing and pipe, left in or removed from the well on lot 9 by defendant when this well was destroyed, nor, since it is not involved in the consequence of the rescission, have we taken any account of the destruction of the well on lot 17.

The sum total of all the circumstances is a conclusion that a rescission would not be equitable and should, therefore, have been refused, as it was. Rescission depends upon a judicial discretion and it may be denied in such a case as we have summarized. See: Hatch v. De la Garza, 7 Tex. 60, at page 64; Herndon v. Rice, 21 Tex. 455, at page 458; 9 Am.Jur. 353, Sec. 5; 12 C. J.S., Cancellation of Instruments, § 3, page 943; Black on Rescission and Cancellation, Sec. 644.

As we have stated previously, it is a consequence of these conclusions that Point 21, assigning error to the exclusion of the trial amendment, and Point 25, assigning error to the exclusion of Ebberts' testimony about misrepresentations by Carpenter concerning the legal effect of the contract papers are not material.

Point 22 is overruled. Carpenter testified that he discovered the mistake concerning the location of the wells in September, 1944, less than a year after the sale to defendant. The excluded evidence tended only to prove that this mistake was not discovered until several years later, when the suit was filed. Since Carpenter's testimony is an element of the proof going to show that defendant accepted the contract of sale and showing that many expenditures by the defendant were made with knowledge of the mistake, the exclusion of evidence tending to prove the contrary would seem to be harmless to the plaintiffs.

Points 56, 57 and 59 assign error to the exclusion of Ebberts' testimony concerning the value of the personal property sold to defendant, the value of the Hebert leasehold of 1940, and the value of Mrs. Ebberts' one-third interest in lots 11 to 16, inclusive. These points are overruled. Under our

view of the rules governing plaintiffs' right to a rescission the admission of this testimony would only strengthen our conclusion that a rescission would be unjust.

Points 50, 51, 52 and 53 assign error to the trial court's action in instructing a verdict for the defendant on the ground that issues of fact concerning the values of the personal property, the Hebert leasehold, and Mrs. Ebberts' one-third interest in lots 11 to 16, inclusive, were raised by the evidence and should have been submitted to the jury. These points are overruled. Our conclusion that a rescission was rightly denied the plaintiffs requires this, and the testimony concerning these values was either stricken after admission or else was excluded, and as a consequence no issues of fact were raised thereby.

 Point 27 assigns as error that the contract of purchase and sale between plaintiffs and defendant was made under a mutual mistake of fact which would authorize a rescission of that agreement.

The mistake referred to concerns the location of the producing well. Ebberts told Carpenter during the preliminary negotiations that this well was on lot 19, which belonged to his wife, and Carpenter accepted this statement as being true and acted on it in making the contract with plaintiffs in defendant's behalf. According to plaintiffs' (Ebberts') admission made during the trial of the cause, this well was on lot 18 instead of lot 19, and Ebberts' statement to Carpenter that this well was on lot 19 was therefore false and constituted a misrepresentation of what was evidently a fact material to Carpenter, and thus, to defendant. However, the defendant is willing for the contract of purchase and sale to stand in spite of this misrepresentation and such injury as it may have caused the defendant.

The only injury claimed by the plaintiffs from this mistake about the location of the producing well concerns the effect which this mistake had upon Ebberts before he began his negotiations with Carpenter. Ebberts testified that if he had known that the producing well was on lot 18, and thus on the leasehold covered by the Hebert lease of 1940, he would have been in no danger

of losing that lease (under his construction of the lease) and he would not have decided to sell it. In consequence, the plaintiffs would never have made their sale to defendant in December, 1943. The mistake, then, according to Ebberts' testimony, caused Ebberts to decide to sell the Hebert lease of 1940, and in train from this decision followed the sale of plaintiffs' property to the defendant.

The defendant put in documentary evidence tending to show that Ebberts knew that the producing well was on lot 18 when he told Carpenter that it was on lot 19. This evidence consisted of Ebberts' application to the railroad commission for a permit to drill the well, which was dated April 25, 1934, and of Ebberts' report to the Commission concerning his action under this permit and his application for a certificate of compliance with the conservation laws, which was dated January 7, 1938. Ebberts said that his producing well was drilled under this application during 1934, and his testimony shows that his application for permit represented the prospective well to be on lot 18 and that the application for certificate represented the completed well to be on lot 18. These documents were made and filed by Ebberts and the application for certificate is signed and sworn to by him.

Ebberts testified that a producing well was located on the western end of a lot which adjoined lot 19 on the north and that he wanted to put his own well as near to that one as he could. The maps in evidence show that this lot on the north extends clear across the northern ends of lots 14 to 19, inclusive, of the subdivision in which lots 19 and 18 lie. The eastern line of lot 14 is an extension of the eastern line of this lot on the north. The western line of lot 19 is a very few feet east of a southward extension of the western line of this lot on the north and a location on lot 19 seems to be about as close as Ebberts could get to the producing well on the north. Ebberts testified further that in order to fix the location of his own well, he began at the site of an old well on lot 16, which lies east of lot 19; that from this point he went to the north line of lot 16, which continued on westward is the north line of lots 17, 18 and

19, and then "stepped off" a distance westward along this north line to a point which he thought was equidistant between the eastern and western lines of lot 19, and then turned and "stepped off" southwards a distance of 50 feet from the north line of the lot which he thought was lot 19. It was at this point that he drilled the producing well and it was in this way that he determined and fixed the location at which this well was to be drilled. He said that he thought this well was on lot 19 when he made the contract of purchase and sale with Carpenter in December, 1943.

Ebberts gave little explanation of the inconsistency between his applications for permit and certificate on the one hand and his conduct in locating the well on the other hand. The applications do not contain any lot numbers, but to each was attached a plat, prepared by Ebberts, and it was from his examination of these plats that Ebberts testified that both applications fixed the location of the well on lot 18, instead of on lot 19. He said that he made the plat attached to his application for permit from another map, and it is evident that he did this expecting his permit to cover the location he intended to make near the producing well north of the property on which he expected to drill. Doubtless this plat he made represented a mistake of fact on his part. It is not clear from his testimony whether he then located the site of his own well without giving further thought to his application, or whether he realized his error when he fixed the location of the drilling site and deliberately disregarded the terms of his permit; the construction of his testimony was a matter for the jury. He did testify that he did not know why he filed an application for certificate of compliance which represented the drilled well to be on lot 18 instead of on lot 19 where he said he had drilled it.

It was after the applications for permit and certificate were proved that plaintiffs admitted the producing well to be on lot 18, stating however that they did not admit knowledge of this mistake prior to May 6, 1949, which was the date of a deposition by Carpenter mentioning the mistake about the location of the producing well. They say that they made this admission only to perfect an agreement with defendant's proof which would raise the issue of mistake brought forward under Point 27.

The evidence which has been summarized (and the other circumstances collected under defendant's counter point 14) made it a question of fact, whether Ebberts did or did not really believe that the producing well was on lot 19 when he told Carpenter, during the negotiations between them in December, 1943, that it was. However, it is really not material to the adjudication of Point 27 whether the misrepresentation to Carpenter about the location of the producing well was honestly made or not.

Turning to another matter, it is apparent that even if Ebberts was mistaken about the location of the producing well when he decided to sell the property and when he made the misrepresentation to Carpenter during the negotiations between them, this mistake was not known to, or caused by, or contributed to by Carpenter and defendant, but that it was, instead, wholly caused by Ebberts' own failure to ascertain facts material to the proper and lawful conduct of his own business, about property which was in his possession and under his dominion for years.

Point 27 is overruled. The mistake which caused Ebberts to decide to sell his property affected only his motive, and ordinarily equity will not decree a rescission because of such a mistake. See: 17 C.J.S., Contracts, § 143, page 497; Wheeler v. Holloway, Tex.Com.App., 276 S.W. 653; Adams v. Pardue, Tex.Civ.App., 36 S.W. 1015, at page 1016; Darnell v. Dolan, 63 Tex.Civ.App. 386, 132 S.W. 857; Brown v. Levy, 29 Tex. Civ.App. 389, 69 S.W. 255; State v. Scholz Bros., Tex.Civ.App., 4 S.W.2d 661; Woodward & Hardie, Inc., v. McMillan, Tex.Civ. App., 34 S.W.2d 357; First National Bank v. Burkham, 32 Mich. 328; J. A. Coates & Sons, Ltd. v. Buck, 93 Wis. 128, 67 N.W. 23.

Further, this mistake was unilateral as far as Ebberts was concerned. Cole v. Kjellberg, Tex.Civ.App., 141 S.W. 120. It does not appear that the mistake injured the plaintiffs otherwise than by affecting Ebberts' motive. See: Herndon v. Hayter,

Tex.Civ.App., 28 S.W.2d 885; Williston on Contracts, 2nd Ed., Sec. 1593. It seems unlikely that plaintiffs would have gotten more money or other payment for their property. After this mistake had operated upon Ebberts and produced its consequences, it became a matter of positive misrepresentation by Ebberts to Carpenter, the defendant's agent. See: Cole v. Kjellberg, Tex. Civ.App., 141 S.W. 120. If the mistake proved to be material to the defendant, and it doubtless was, this misrepresentation afforded the defendant ground for complaint against Ebberts, even though honestly made. Altgelt v. Gerbic, Tex.Civ.App., 149 S.W. 233; Williston on Contracts, 2nd Ed., Sections 1500 and 1540. Why under the circumstances of this case it should also authorize relief to the person who made it against the defendant, to whom he made it, is not so apparent. For the defendant has changed its position in reliance upon this misrepresentation by Ebberts, and a rescission in favor of Ebberts would, on plaintiffs' theory of the facts, subject the defendant to heavy liability in damages if Ebberts' proffered testimony about values is a criterion.

Further, Ebberts had it within his power to know the facts; the responsibility for his error and for the subsequent error by the defendant in reliance upon his statements is wholly his. To comply with the conservation laws and to properly conduct his own business he should have known the facts and no reason appears why he did not, except his own careless method of locating the site of his well. See: Wheeler v. Holloway, Tex.Com.App., 276 S.W. 653; San Antonio National Bank v. McLane, 96 Tex. 48, at page 55, 70 S.W. 201. This is a circumstance to be considered.

The sum total of all of these considerations is the conclusion that it would be inequitable to rescind the purchase and sale of December, 1943 between the plaintiffs and the defendant because of the reasons advanced under Point 27; and it is upon this general ground that Point 27 is overruled. O'Connell v. Duke, 29 Tex. 299, 301, is not in point. That case invoked an element of unjust enrichment of one party and an equivalent loss by the other party which is not in this case. Further, the injured party could be protected against loss and the other party still give the value (the quantity) he bargained for without subjecting this other party to the loss of anything except that part of his bargain which it was unjust for him to keep. Further, the effect of the mistake extended beyond the motive of the injured party.

Point 28 assigns as error that Ebberts' application for permit and his application for certificate which are mentioned in our discussion of Point 27 did not have the effect of judicial admissions by Ebberts and that this evidence was competent only for the impeachment of Ebberts. Defendant argues under counter point 14 that this evidence, with a number of other circumstances, showed as a matter of law that Ebberts' misrepresentation to Carpenter of the location of the producing well was fraudulent.

It is not material, between the plaintiffs and the defendant, whether these applications by Ebberts constitute conclusive proof of the facts recited because Ebberts has made a judicial admission that the producing well was located on lot 18, as these applications represented it to be. But we agree with the plaintiffs that these applications did not amount to judicial admissions. Harris County v. Hall, 141 Tex. 388, 172 S.W.2d 691. However, these applications were made by one of the parties to the suit, and being inconsistent with his theory of the facts and with testimony given by him on trial, constituted such substantive evidence as would support a finding of fact, and were not limited, in competency, to use for the impeachment of Ebberts. Consequently, these papers were available to the defendant as evidence tending to show that Ebberts' misrepresentation to Carpenter about the location of the producing well was fraudulent. See: McCormick & Ray, Sec. 489, pages 626, 627; Sec. 492; Trice v. Bridgewater, 125 Tex. 75, 81 S.W.2d 63, at page 67 (Hn. 2), 100 A.L.R. 1014.

We have held in our discussion of Point 27 that Ebberts' honesty or not in making the misrepresentation to Carpenter was a

question of fact for the jury. The defendant's argument under counter-point 14 that the evidence shows as a matter of law that Ebberts knew he was misrepresenting the facts bears only on the weight and preponderance of the evidence. In truth, if the maps in evidence are accurate, and if Ebberts' testimony is to be believed that he tried to put his own well as near to the producing well on the north as he could get and if he has correctly located that well, it is difficult to see how his own producing well could be on lot 18 instead of lot 19. However, his admission that the well was on lot 18 necessarily implies that he did not correctly fix the position of the well by which he wanted to fix the location of the well to be drilled, or else necessarily implies that he did not approach as near to that other well as he says he did.

Points 34 to 42, inclusive, and Point 60 assign matters involved in intervenors' claim. Intervenors alleged that the Hebert lease of 1940, which they had made to Ebberts, terminated by abandonment, either within 90 days after Ebberts' sale of the lease to the defendant or at the end of its primary term, and that the lease was a cloud on their title. They also alleged title to the well on lot 9 which the defendant destroyed in 1947 or 1948 but, in any event, after the end of the primary term of the lease, and to the pipe in said well. They prayed that the cloud on their title be removed and that they recover the value of the well and of the pipe. In their supplemental petition intervenors alleged that when they made their lease of July 5, 1940, it was assumed by all parties (by them and by Ebberts, the leasee) that there was no production from the leasehold; and they prayed that the lease be reformed by excluding lot 18, if the producing well was on that lot, and that it then be canceled.

The Hebert lease of July 5, 1940, was for a primary term of five years, and it was to continue as long thereafter as oil or gas should be produced. The defendant did nothing to keep the lease in force beyond the end of the primary term except to operate the producing well; and when Carpenter bought this lease, he thought that this well was on Mrs. Ebberts' lot 19, outside of the leasehold, and he said that he continued to think so until September, 1944, just after he completed the work done on the well represented by Ebberts to be on lot 18. Ebberts said that this work was done during the late spring or early summer of 1945, a good deal later than the date set by Carpenter. This well was in production long before the Hebert lease of July 5, 1940, was made. The facts are related in our supplemental findings, but it may be repeated here that the well was drilled in 1934, apparently during April and May, by the partnership of Ebberts, Falloure, and the Hebert Estate (or Mrs. J. J. Hebert, Sr. or her son, J. J. Hebert, Jr.), and it was operated thereafter by this and by successor partnerships and finally by Ebberts as successor to the partnerships. With some interruptions which are not material here production from this well has been continuous; the last month shown on the final table of production (S.F. 572) is March, 1950. The various tables of production at S.F. 570, 571, 568 and 572, in that order show that during a period beginning with July, 1939, and ending with March, 1950, intervenors have regularly and consistently been paid a royalty of .0625 (1/16th) of the net production from this well; and since defendant's purchase of December 28 and 29, 1943, these payments have been made by defendant. These payments were actually disbursed by the purchaser of the oil under division orders, but the purchaser may be regarded as acting for the defendant. This percentage was one-half of the royalty reserved in the Hebert lease of July 5, 1940; the agreement which fixed the royalty before that lease was given by intervenors to Ebberts was not fully proved, but this royalty obviously was the same as that paid under the lease. This division of the total royalty was determined by the pooling agreement of 1914 between the plaintiffs and intervenors' parents. Because of this agreement it was immaterial, so far as income from the producing well was concerned, whether the well was on Mrs. Ebberts' lot 19 or on intervenors' lot 18; Mrs. Ebberts and intervenors each received the same income from the well in

either event. Consequently, intervenors and Mrs. Ebberts each continued to be paid the same royalty from the well after Carpenter discovered that the well was on intervenors' lot 18 as each had received while he thought that the well was on Mrs. Ebberts' lot 19.

The well on lot 9 was also in production before the Hebert lease of July 5, 1940, was made. The facts are related in our supplementary findings. It may be repeated here that the well was drilled in June and July, 1939, about a year before the lease was made. The table of production (S.F. 569) begins with August, 1939; it is to be remembered that no production was had from lot 8, referred to on this table, during the period covered by this table. With interruptions which are immaterial here, this production continued past the date of the Hebert lease of July 5, 1940, up through November, 1942, about two and one-half years after that lease was made. Our supplemental findings show that we have concluded that this well was drilled and operated as a venture of the partnership between Ebberts and intervenors. The facts concerning this partnership are related in our supplemental findings. The partnership was wound up by written agreement dated July 3, 1940, just two days before the lease was given and just three days after division orders had been made by the parties; and under this agreement Ebberts acquired the partnership's assets. We have concluded that the lease, necessary as it was to fix Ebberts' title and the intervenors' rights, was an incident of the winding up and termination of the partnership or association between intervenors and Ebberts.

Ebberts first testified that the producing well was on Mrs. Ebberts' lot 19, but the various documents which he had made and filed with the Railroad Commission in 1934 showed this well to be on intervenors' lot 18; and after these documents were proved, the plaintiffs, that is, Ebberts and Mrs. Ebberts, formally admitted in writing that the well was on lot 18, but disclaimed knowledge during the negotiations with Carpenter that the well was so located.

There is no proof of what intervenors knew or did not know about the location of the producing well when they made their lease of 1940 to Ebberts. The terms of the lease itself are consistent with an intention that it apply to production existing when it was given; and the findings concerning lot 9 show conclusively that production was coming from lot 9 when the lease was made and the lease covers lot 9. Obviously, intervenors did in fact intend for their lease to apply to *some* existing production, and their allegation that all parties to the lease assumed the leasehold to have no production on it when the lease was made was affirmatively disproved.

The defendant according to Carpenter operated the producing well for nearly a year under the impression that it was not on the Hebert leasehold but was, instead, on Mrs. Ebberts' lot 19; and according to Ebberts' statement that the work on the well represented to be on lot 18 was done in 1945, the jury might have found that defendant's mistake lasted six or seven months longer. It was Carpenter's construction of the Hebert lease that it was for an unconditional term of five years, so that he considered nothing to be required of defendant during the primary term. But he said that after he discovered that the producing well actually was on intervenors' lot 18 he elected to hold the Hebert lease of 1940 by production from this well.

Carpenter's belief, treated as the belief of the defendant, that the producing well was on Mrs. Ebberts' lot 19 was caused by Ebberts' statement to him that the well was on this lot and so was his belief that the well on lot 17 was on lot 18.

Points 34 to 42, inclusive, and Point 60 are all overruled.

■ In considering these points, it is to be borne in mind that intervenors are claiming affirmative relief against the defendant, and that the burden of proof on both of their prayers rested on them, that is, the burden rested on them to show that their lease of July 5, 1940, had expired and that they owned the casing and pipe which was pulled from the well on lot 9 by the defendant's agent, or else that they had equitable grounds for reformation and cancellation.

 It is assigned in Points 34 and 35 that the production from the producing well has not kept the Hebert lease of 1940 in force and that the lease has lapsed as for abandonment by the lessee because Carpenter and Ebberts contracted for the purchase by, and the sale to, defendant of the lease on the basis that this well actually was not covered by the lease and that production from another well or wells would have to be made to keep the lease in force. Plaintiffs and intervenors seem to say that this assumption about the necessity of additional production to keep the lease in force was a part of the consideration for the sale of the lease. In effect, they also attempt to put the producing well outside of the lease by invoking the doctrine of estoppel by contract to prevent the defendant's denial that the well is outside of the lease.

It undoubtedly was Carpenter's assumption in 1943 that defendant would have to develop the lease either by reworking the dead wells or by drilling new ones, because he thought that the only producing well purchased by him was outside of the leasehold. However, we think that additional work on the lease by defendant was not a part of the consideration promised by him or bargained for by the plaintiffs, except as work on the well on lot 9 might be required to produce the oil payment reserved in that well, or, on plaintiffs' theory of the contract, as it might be involved in the promise, claimed by the plaintiffs, to rework this well. The doctrine of estoppel by contract (or deed) is not applicable for several reasons: First, the assumption by Carpenter that the well was on Mrs. Ebberts' lot 19 which the plaintiffs and the intervenors would now prevent him and defendant from denying, was caused by Ebberts' misrepresentation of the facts, and it cannot be of any consequence that Ebberts thought he was right. Second, intervenors were not parties to the contract between plaintiffs and defendant, in person or by agent; the contract was not made for their benefit; and they do not claim title under the parties to that contract. *Intervenors' rights are fixed wholly by their lease to Ebberts, which Ebberts has conveyed to the defend-* *ant.* Third, since we have denied the plaintiffs a rescission of their contract with the defendant, their rights concerning the Hebert lease depend upon such terms of their contract with defendant as they are entitled to enforce against the defendant.

These conclusions also adjudicate Point 36, which assigns as error that it was an issue of fact, whether Carpenter and Ebberts intended the lease to be kept in force by production from the well they thought to be on Mrs. Ebberts' lot 19. This intention is not material to the intervenors, and it is not material to the plaintiffs except as it may have some bearing on their enforcement of their contractual rights.

 Point 37 assigns as error that the proof was in conflict concerning the location of the producing well. This is a very material ·question because the lease, even under defendant's construction of its terms, expired in July, 1945, if the well was on Mrs. Ebberts' lot 19. However, the conflict in proof which plaintiffs and intervenors claim does not exist. For evidence that the well is on Mrs. Ebberts' lot 19, they rely on the testimony which Ebberts first gave. As we have stated, Ebberts first said that the well was on Mrs. Ebberts' lot 19 but after the proof of the papers filed by him with the Railroad Commission pertaining to the drilling of this well, the plaintiffs (Ebberts was one) formally admitted, in writing, that the well was on intervenors' lot 18 and within the leasehold granted by the Hebert lease of 1940. So far as plaintiffs were concerned and of course so far as Ebberts was concerned this admission simply destroyed Ebberts' prior testimony. This testimony ceased to be of any probative force between plaintiffs and defendant on the issue concerning the location of the well. See: Shaw v. Korth, Tex.Civ. App., 26 S.W.2d 351, at page 353 (mo. reh.); McCormick & Ray, Sec. 494, p. 633. This consequence will also have to be attached to the intervenors' case, at least as far as they would use Ebberts' testimony to contradict his admission on the issue of location, to which that admission applied. It would be paradoxical to deny testimony any effect whatever in behalf of the party

634

who gave it, while allowing it to have full force in behalf of another party on the same issue of fact. Intervenors' refusal to agree to the plaintiffs' admission prevented the admission becoming a stipulation and left intervenors free to contradict Ebberts and to prove their own theory of the facts, but intervenors' refusal cannot be given the effect of limiting the consequences of Ebberts' formal written admission. The testimony was not intervenors'; it was Ebberts', and the party-witness, sitting as he does under what the courts usually refer to as the pains and penalties of perjury, has sole control over his own testimony. Intervenors had no right to interfere with him.

The testimony of Ebberts that he tried to put the well as near another well on the north as he could, and the map which would put Ebberts' well on lot 19 if this was true did not raise an issue concerning the location of Ebberts' well. The admission necessarily implies, as we have already stated, that this testimony was wrong, and this testimony was as much destroyed by the admission as were the statements that the well was on lot 19.

Point 38 invokes a provision of the Hebert lease which permitted interruptions of production for a period not exceeding 90 days; but this provision is not material to the question, whether the Hebert lease has expired. The producing well which defendant operated for a while under the impression that it was outside of the lease has not been interrupted in production for any period amounting to 90 days, and the provision could not apply to this well. Defendant admits that no production was ever had by defendant from the well on lot 9, but if the producing well kept the lease in force then the well on lot 9 need not be considered. And if the producing well did *not* keep the lease in force then the lease expired not later than the end of its primary term in July, 1945. The question, that is, is not to be determined by the provision governing interruption of production, for if the producing well is on the leasehold, there has been no interruption for the period of time stated in the provision. The defendant has continuously produced oil and has never abandoned the leasehold. More than 90 days did intervene between the cessation of production from the well on lot 9 and the defendant's discovery that the producing well was on the leasehold, but this is not the interruption of production governed by this 90 day provision invoked by intervenors and that fact does not settle the issues between defendant and intervenors. The question, whether the lease expired or still exists, is to be determined by considering whether admittedly continuous production from a producing well assumed now to be on the leasehold made, however, under a mistake of the fact then existing about the location of the well, comes within the meaning of the language which states how long the term of the lease shall last. This matter is discussed hereinafter.

Points 34 to 38, inclusive, are briefed as a group and in the argument thereunder references are made to the claim by intervenors of a right to rescind their lease of 1940 because it was given under a mistake as to the location of the producing well (if the well is on lot 18) and also to their claim of a right to exclude lot 18 from the lease. We do not see how this reformation could be granted intervenors. They intended to lease lot 18 and did so. Carpenter intended to buy a lease on lot 18 and did, in fact, take an assignment of such a lease. There seems to be no basis on which to split up the Hebert lease of 1940 by such a reformation as intervenors have prayed for, and intervenors' remedy in equity, if any they have, for having leased an oil well they did not know they owned would seem to be rescission. The burden of proof was on them, and the proof does not show that they made a mistake, because it does not show what they knew or did not know about the location of the producing well when they made their lease to Ebberts. There may be evidence raising an issue of fact as to whether Ebberts believed the well to be on his wife's land when he took the lease, but no belief on the part of intervenors' can be inferred from this evidence. Intervenors certainly did intend their lease to cover existing production because the well on lot 9 was in production

when they made their lease to Ebberts, and they had been receiving royalties from this well, according to the table of production at S.F. 570. With these facts are to be considered the nature of the intervenors' association with Ebberts and the winding up and termination of this association by an instrument dated only two days before the lease. For the facts we refer to our supplemental findings. We have pointed out there that some of the acknowledgments to the paper winding up the partnership and to the lease were taken before the same officer on the same day, namely, the 8th of July, 1940, subsequent to the dates of both the paper winding up the partnership and the lease.

■ We pass now to consideration of the question mentioned before, whether, under the circumstances of this case, defendant's production of oil from the leasehold under the mistaken belief that the well was outside of the leasehold kept the lease in force, or whether, because of the mistake, the lease terminated as by abandonment or by the operation of the limitation on the lessee's estate.

The lease provides: "* * * lessor, for and in consideration of Ten and 00/100 Dollars * * * and of the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed, has granted, demised, leased, and let and by these presents does grant, demise, lease and let unto the—lessee, for the sole and only purpose of mining and operating for oil and gas—all that certain tract of land—described as follows: (description omitted)."

"It is agreed that this lease shall remain in force for a term of five (5) years from date and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."

"In consideration of the promises the said lessee covenants and agrees: 1st. To deliver to the credit of lessor, free of cost, in the pipe line to which lessee may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises."

(Paragraphs 2nd and 3rd provide for royalties on gas and are omitted).

(Paragraph concerning payment of delay rentals. Blanks necessary to be filled in to complete this paragraph and give it meaning were left unfilled).

(Paragraph providing for delay rentals if dry hole drilled during term. It is dependent on the preceding paragraph concerning delay rentals).

(Paragraph providing for continuance of the lease by drilling operations not interrupted more than 60 days if no production from lease "at the expiration of—years" and by production from a well so drilled).

"* * * in the event that oil or gas is produced from said premises and said production shall for any reason cease or terminate lessee shall have the right at any time within ninety (90) days from the cessation of such production to resume drilling operations in the effort to make said leased premises again produce oil or gas, in which event this lease shall remain in force so long as such operations are continuously prosecuted as defined in the preceding paragraph, and if they result in production of oil or gas, so long thereafter as oil or gas is produced in paying quantities from the premises."

(The next two paragraphs are immaterial).

"Title to the minerals vested in grantee under this grant shall not end or revert to grantor until there is a complete, absolute and intentional abandonment by grantee of each and all of the purposes, expressed or implied, of this grant and every part and parcel of the premises described in this grant."

The lease ended with a warranty clause.

Whether the defendant's mistake about the location of the producing well affected the duration of the term of the lease depends upon the meaning to be given the habendum clause of the lease, and that meaning is to be determined by considering the other provisions quoted from the lease and the circumstances attending the making of the lease, as well as the language of the habendum clause itself.

These circumstances are to be borne in mind. (a) Oil was being produced from the leasehold when the lease was given. We shall assume, as plaintiffs argue that upon abandonment of the leasehold during the primary term the lease would end. (b) The mistake seems to have been discovered during the primary term of the lease. Carpenter said that he discovered the mistake in September, 1944. He put this immediately after the completion of the work on the well said to be on lot 18, but Ebberts said that this work was done during the late spring or early summer of 1945. The primary term of the lease ended on July 4th or 5th, 1945, and this was later than the "early summer". The burden of proof to show that the mistake was not discovered until after the end of the primary term would seem to be on the intervenors, if that fact was material, but we shall assume that it was a question of fact whether the mistake was discovered by the defendant before or just after the expiration of the primary term. (c) Defendant has been in possession of the leasehold since the purchase from the plaintiffs in December, 1943, and if the producing well is on the leasehold (on lot 18) has actually been producing oil from the leasehold without any interruption amounting to 90 days. There has certainly never been any physical abandonment of the leasehold if the producing well is on lot 18. (d) Only on a finding that the defendant discovered the mistake after the end of the primary term could it be assumed that defendant intended to abandon the lease. Defendant obviously never intended to abandon the well, so that the intention to abandon the lease would represent a conclusion founded on a mistake of fact. (e) The persons who claim that the continuous production of oil from the producing well did not keep the lease in force, that is, the intervenors, actually got the same income out of the well that they would have gotten if the defendant had thought the well was on the leasehold. This was a consequence of the pooling contract of 1914, made between the plaintiffs and intervenors' parents. (f) The proof does not show that intervenors accepted their royalty payments under a mistaken belief about the location of the well, or, indeed, what intervenors' mental attitude was. The proof only shows that intervenors accepted the royalty payments. (g) The defendant's mistake was made in good faith, with some basis for a claim that defendant was not negligent either in making the mistake or in failing to discover it earlier. The mistake was caused by the statements of the person who had been in possession of, and had been operating, the well for years; and on the evidence, there was nothing to bring the mistake to defendant's attention or to cause defendant to make an investigation until the conversation between Carpenter and defendant's employee after the work was done on the well said to be on lot 18.

The oil produced from the well which the defendant first thought was outside of the leasehold was "produced from said land" within the literal meaning of the habendum clause. The lease authorized assignment by the lessee, and thus this production was made by the person by whom the lease required the production to be made. The lease was effective; it covered lot 18, and thus title to the working interest in the minerals in the land was fixed in the defendant. The literal meaning of the habendum clause thus was complied with. It probably never occurred to the parties to the lease that a situation like this would happen, but the general purpose and object of the parties is shown by the provisions quoted from the lease, including the habendum clause, and this purpose and object was accomplished. This purpose was the production of oil by the lessee or his assignee and the payment of royalties by him to the parties thereto entitled. What the intervenors bargained for, they got.

We have so far considered only the words of the lease. If the circumstances attending the execution and delivery of the lease be considered, the result is not changed because the proof does *not* show that intervenors thought this well was outside of their lease when the lease was made, and the proof *does* show that they intended this lease to apply to at least some existing production, namely, the well on lot 9.

It seems to us that on defendant's theory of the facts, namely, that the producing well is on lot 18, within the leasehold, intervenors' relief, if any they were entitled to, lay in equity and not by way of the operation of the limitation on which the lessee's estate depended or by way of the operation of an abandonment of the lease.

See generally: Ryan v. Kent, Tex.Com. App., 36 S.W.2d 1007; Taylor v. Higgins Oil & Fuel Co., Tex.Civ.App., 2 S.W.2d 288, at page 295 (Hn.5).

We add these comments by way of summary: Intervenors are claiming affirmative relief against the defendant, first by way of removal of cloud and for damages for trespass and conversion, and second, in the alternative, by way of reformation and cancellation. The burden of proof under each prayer was on the intervenors, and on their failure to establish a prima facie case, the proper judgment was one denying them relief against the defendant. This was the judgment rendered between intervenors and defendant. The claim that the lease had expired was founded upon the contention that the producing well was, in fact, outside of the leasehold or else, between the intervenors and defendant, must be treated as being outside the leasehold. Intervenors did not meet the burden of proof respecting the actual location of the well; such evidence as will support a finding shows that the well is *on* the leasehold. A jury could have disbelieved Carpenter, but this disbelief alone would not support an affirmative finding that the well was where Carpenter said it was not. We have overruled the arguments by which intervenors would have it held that the well is to be treated as being outside of the leasehold. As for the prayer for equitable relief, we think that the intervenors also have not met the burden of proof. In consequence the judgment between the intervenors and the defendant was proper.

Points 39 to 42, inclusive, and Point 60 raise the intervenors' claim to the value of the pipe in the well on lot 9. Intervenors have no right to this pipe unless their lease expired before this well was destroyed by defendant, and since the judgment of this court is that they did not prove this fact, these points must be overruled.

Points 54 and 58 refer to plaintiffs' claim to damages for defendant's destruction of the well on lot 17. Point 58 assigns error to the exclusion of Ebberts' testimony about the value of the well and Point 54 assigns error to the instruction of a verdict against the plaintiffs on this claim.

The defendant had no title to lot 17 and destroyed the well two or three years after the time when Carpenter said that he discovered the well to be on lot 17. Consequently, if plaintiffs owned lot 17 or the well thereon, they were entitled to damages for defendant's destruction of the well.

But the only title claimed by plaintiffs is one based on the 10-year statute of limitation; Ebberts said that throughout the period of limitation he thought lot 17 was owned by one Bashara. In December, 1933, Ebberts took an assignment from the Texas Pipe & Supply Company of some oil and gas leases; and the facts concerning this assignment are related in our supplementary findings. The assignment was made to Ebberts individually but Ebberts took title in trust for a partnership, the members of which were himself, one Falloure and the Hebert Estate (or Mrs. J. J. Hebert, Ebberts' sister in law, or her son, J. J. Hebert, Jr., acting for her).

Ebberts' testimony regarding his claim to and possession of lot 17 is very brief and general, and is indefinite in material respects. However, the substance of it seems to be this, that when the assignment was made to him by the Texas Pipe & Supply Company, he "took charge" of what now appears to be lot 17 and claimed that lot for his own until the sale to defendant in December, 1943. He said that he erected a small structure of corrugated iron on this lot, containing a toolroom and a bath house, that his "pipe rack was on it and lead lines were across it," that he used the property continuously and that "it was the center of the operations, both end of the lease." He said that no one had interfered with his possession and that he had not been sued for

the land. He did not say when his various improvements were erected or made, and he did say that he acquired an oil and gas lease on lot 17 under his assignment from the Texas Pipe & Supply Company. Actually, he did not for reasons stated in our supplementary findings. However, Ebberts' construction of the Texas Pipe & Supply Company assignment bears directly on the nature and legal effect of his claim and seems inconsistent with a claim of title adverse to the owner.

Aside from these comments, the evidence conclusively demonstrates that Ebberts' claim to lot 17 was either secret or else was subordinate to the title of intervenors, for during the entire period from the date of the Texas Pipe & Supply Company assignment to the sale to defendant, Ebberts says he thought that this property was lot 18, not lot 17. During this period he knew that lot 18 belonged first to his sister-in-law, Mrs. Lula Hebert, and after her death in 1939 to his nephew and partner, Joe Hebert, Jr., and the latter's sisters, the intervenors, the said Joe Hebert and the intervenors being the children of Mrs. Lula Hebert and the nephew and nieces of Mr. and Mrs. Ebberts. Mrs. Ebberts was Mrs. Hebert's sister and the aunt of Joe Hebert and intervenors. Throughout the period of limitation Ebberts' various partnerships included Mrs. Hebert, Joe Hebert, Jr., and intervenors; and Ebberts did many things in association with these various people which recognized their title to lot 18, on which Ebberts thought he was during the limitation period. In the first place, the Texas Pipe & Supply Company assignment purported to convey to Ebberts a lease covering lot 18—with which throughout the limitation period Ebberts identified the property claimed. In this assignment the lease is styled "the Hebert and Ebberts lease" and in the assignment under which the Texas Pipe & Supply Company took title it is styled a lease by "J. J. Hebert et al." As we have stated, Ebberts said that his entry occurred after he got this assignment from Texas Pipe and Supply Company. Further, the partnership for whom Ebberts took the assignment from the Texas Pipe & Supply Company in October, 1933, acquired a producing well on lot 21 under this assignment and operated it about two years, that is, until some date in 1935. This well was only about 300 or 400 feet from the property; and in 1934 this partnership drilled the well said to be on Mrs. Ebberts' lot 19, about 150 feet from the property but now said by defendant and admitted by plaintiffs to be on lot 18, immediately adjacent to the property. Both wells were operated during the same period of time for a while, and Ebberts' statement that his "pipe rack was on it and lead lines were across it" and that "it was the center of operations, both ends of the lease," implies that Ebberts was using the property for the business of the partnership. In 1938, some 3 or 4 years after the well on lot 21 was destroyed, Ebberts said he drilled a well on lot 16, on the other side of the property. He claimed this for his own venture, but the evidence of his title and the papers he filed with the Railroad Commission contradict him and show that it was another venture of his partnership. In 1939, the well on lot 9 was drilled. This well also lay on the other side of the property, that is, the property lay between the well represented to be on lot 19 and the wells on lot 16 and lot 9; and the well on lot 9 also involved the Hebert family. The statement of Ebberts' quoted above implies that the property claimed was used in connection with this well on lot 9. The winding up of the partnership between Ebberts and intervenors in July, 1940, and the acceptance at that time by Ebberts of a lease on lot 18 from intervenors (less than ten years after Ebberts' entry on the property which, to repeat, he said was made after the assignment of October, 1933, from the Texas Pipe & Supply Company) was a positive recognition at that time by Ebberts that the property he occupied belonged to intervenors. To repeat again, Ebberts said that he thought the property was lot 18, and he knew that lot 18 belonged, first to his associate Mrs. Lula J. Hebert, and then afterward to her children, namely, J. J. Hebert, Jr., and those of the intervenors other than Mr. Hebert's widow, all of these being Ebberts' associates, and after Mr.

Hebert's death, to intervenors, also Ebberts' associates. He recognized intervenors' title after the lease was made by paying intervenors royalties under the lease, first from the well on lot 9 and then, from that well and the one he told Ebberts was on lot 18 but which defendant and plaintiffs now say is on lot 17, the property claimed. The facts are stated in detail in our supplementary findings.

From all of the circumstances, that is, the relationship of the plaintiffs and the Hebert family, the association of Ebberts and the Hebert family in partnership for many years, their production of oil from properties belonging to members of the partnership throughout the period of adverse possession down to the time of 1940, the apparent use of what Ebberts thought was lot 18 for the purposes of this association and this production and his knowledge that lot 18 belonged to his relatives and associates, the entry on lot 17 under an assignment which purported to give Ebberts and his partners a lease on lot 18, the entry being made under the mistaken belief that the property actually was lot 18, the affirmative acknowledgment of the Hebert title by the lease of July 5, 1940, less than 7 years after Ebberts says that he "took charge" of the lot which proved to be lot 17, the subsequent recognition of the Hebert title by the payment of royalties to the Heberts, and the continued assumption throughout the period of limitation that Ebberts was occupying property which he knew to belong to his relatives and business associates, all these circumstances necessarily imply that any claim of title by Ebberts to the lot he thought was lot 18 was in apparent subordination to the supposed Hebert title to the property; and that before he took the Hebert lease of 1940, that he was not intending to acquire title from them; and while Ebberts' possession may have vested the Heberts with some interest in lot 17, we perceive nothing in it which would give Ebberts title. The possession of the minerals by Ebberts did not begin until the "side tracking" of the well on lot 17 and according to Ebberts this occurred in 1941 or 1942, not long before Ebberts made his sale to the defend-

ant, and it invoked a recognition of the Hebert title. Points 54 and 58 are overruled.

Our conclusions suggest that Ebberts' possession prior to the date of the Hebert lease of July 5, 1940, in mistaken subordination to the Hebert title, could be tacked to the possession after the lease was given, also held under the same mistake, and that in this way Ebberts raised an issue of fact, whether he had acquired title to a mineral interest in, and to the well on, lot 17. This is not Ebberts' theory of the facts, and consequently he is not entitled to relief on that basis. Ebberts propounds a mental claim of possession for himself for the first 6 or 7 years of his occupancy (from his entry until the Hebert lease was made to him) while conducting himself in a way which exhibits to the eye of a third party subordination to the supposed title of another, without any intention of acquiring title from that other. We think that the proof shows as a matter of law that Ebberts' claim was either wholly secret and suppressed or else that he never did have the claim in mind before he took the Hebert lease; or if we be wrong here, that the evidence so tending to prove the secrecy and suppression or absence of Ebberts' claim so overwhelmingly preponderates over any to the contrary that we must find that Ebberts failed to prove his claim by a preponderance of the evidence.

Point 33A is adjudicated by the holding under Points 34, et seq., that the defendant was not estopped to show where the well represented to be on lot 19 actually was.

We have considered all Points of Error except the following: Nos. 29, 30, 31, 32, 33, 43, 44, 45, 46, 47, 48, 49, 53 and 55. These points have been considered but are overruled, either as presenting no error or as being immaterial.

We agree with plaintiffs that the 2-year statute of limitation does not govern the suit to rescind Ebberts' assignments of oil and gas leases, his written transfer of personal property, and Mrs. Ebberts' deed; and we agree that it was a question of fact, whether more than 4 years intervened between the time when defendant, acting

through Carpenter, did the work on the well represented to be on lot 18 and the time when this suit was filed, namely, on March 8, 1949. But the statute of limitation is not material to a decision of this appeal, nor is the doctrine of laches; and thus appellants' defenses in bar of the statute and of defendant's claim of laches are consequently also immaterial.

We have considered all of the Points of Error assigned by the appellants. We find no ground of error which requires or authorizes a reversal of the judgment of the trial court. That judgment is accordingly affirmed.