PER CURIAM.
The two corporate appellants were defendants below in an action brought by the appellee for breach of contract. The underlying theory of the plaintiff’s cause of action was that the two defendants committed certain voluntary, affirmative acts which cause the destruction of the source of potential payment to the plaintiff, and therefore became obligated to pay those monies which were conditionally due in the future. After extensive pleadings had been filed, the trial court, sitting without a jury, entered a final judgment in favor of the plaintiff assessing his damages at $1,000,000.00, plus interest.
In 1951, the two corporate appellants entered into a thirty-year lease with the owner of the Ambassador Hotel of Atlantic City, New Jersey, under which they were to pay $427,000.00 per year for a leasehold interest in the hotel. Under this lease, appellant Americana Hotel, Inc., was the primary obligor for the rent, and appellant Tisch Hotels, Inc. was the guarantor for that obligation. In 1956, at which time the lease *273 had 25 years remaining, the two corporate appellants assigned the lease to Atlantic City Hotels, an Illinois limited partnership. Under the assignment, Atlantic City Hotels was primarily liable to the owner of the Ambassador Hotel for the annual $427,000.-00 rent payments according to applicable New Jersey law. Moreover, as security for the assigned lease, the two corporate appellants took back a mortgage wherein Atlantic City Hotels was mortgagor, for $195,000.00 per year, payment to commence on January 30, 1965 for 10 years. The mortgage was secured by, first, the Ambassador Hotel leasehold interest itself, and secondly, by the fee simple title to the Traymore Hotel, also located in Atlantic City, New Jersey.
After certain occurrences between the parties to this appeal (which are not pertinent hereto) a Settlement Agreement was drawn up which provided as follows: Americana Hotel, Inc., assumed the capacity of primary promissor; its parent corporation, Tisch Hotels, Inc. stood as guarantor. Among the promises contained in the Settlement Agreement for which the two appellants were obligated to appellee Zable, are the following provisions: (a) promise to make direct payment to Zable of $500,000.00 (which was duly paid); (b) contingent promise of payment to Zable of $1,000,000.-00 which was predicated, however, upon the occurrence of any one óf six separate circumstances. Each of the six conditions were dependent upon the fate of the Ambassador leasehold mortgage or of the lease itself which had been executed between the owner of the Ambassador Hotel and the defendants.[1]
The only specific prohibition contained in the Agreement was that Americana Hotel, Inc., was prohibited from accepting a voluntary reconveyance of the property or property rights encumbered by the mortgage. It should be noted here that according to the terms of the mortgage, the mortgagor-tenant, Atlantic City Hotels, could not cancel or surrender the lease without the consent of mortgagee, appellant Americana Hotel, Inc.
In 1963, a proposal was made by Atlantic City Hotels to Margolins, the owner of the Ambassador Hotel. This proposal was intended to foster negotiations between these two parties so that Atlantic City Hotels could purportedly acquire fee simple title to the hotel. Subsequently, on March 6, 1964, a contract for sale was entered into by Mar-golins, as owner and vendor of the Ambas *274 sador Hotel, and Ambor, Inc., a subsidiary of Atlantic City Hotels, Inc., as vendee of the hotel. The terms of the contract for sale which were adhered to at the close of the deal on March 20, 1964, were as follows : (1) $50,000 deposit placed on the contract for sale; (2) purchase money mortgage given by the buyers in the amount of $3,-162,445.00; (3) prepayment on mortgage of $350,000.00; (4) a release executed by Tisch Hotels, Inc. in favor of Margolins, for $200,000.00 worth of bonds which had been deposited with Margolins earlier by Tisch Hotels, Inc. as security for the original lease in 1951.
In order to finance the deal, Ambor, Inc. received a $50,000.00 advance from Tisch Hotels, Inc. which was used as the deposit on the contract for sale; moreover, Tisch had also directly loaned $350,000.00 to Atlantic City Hotels, taking in return a fourth mortgage on the Traymore Hotel. Finally, Tisch Hotels, Inc. also promised Ambor, Inc. to stand ready to lend an additional $250,000.00, which was eventually done in the form of a release of the $200,000.00 worth of bonds which had been held by Margolins. Thus, after the deal had been closed on March 20, 1964, the relations of the parties stood as follows: Ambor, Inc. was the fee simple owner of the Ambassador Hotel; Ambor, Inc., as the owner of the hotel, specifically released Americana Hotel, Inc., Tisch Hotels, Inc., and Atlantic City Hotels, as lessees and assigned lessee, respectively, under the leasehold interests on the Ambassador Hotel. On January 29, 1965, Atlantic City Hotels surrendered possession of the Ambassador Hotel to Margo-lins.
Then, the following day, January 30, 1965, Ambor, Inc. executed a quit-claim deed in favor of Margolins, thus effectively recon-veying the fee simple interest in the Ambassador Hotel back to Margolins. The net effect of the complex transaction detailed above was to cause a release of liability from any obligations under the lease on the Ambassador Hotel by the lessees, Tisch Hotels, Inc., and Americana Hotel, Inc., as well as that of the assigned lessee, Atlantic City Hotels. In order to achieve such release of liability, the affected parties expended approximately $600,000.00 which money was received by the owner of the Ambassador Hotel, Margolins.
The legal effect of the above transactions, under the applicable New Jersey law, was to render the leasehold mortgage unenforceable. Therefore, since Zable’s future rights to any monies, under the Settlement Agreement, were contingent upon the mortgage payments, he was unable to directly assert any rights under the Agreement to any monies due because of the destruction of said leasehold mortgage.
Thereafter, Zable instituted this action in the Circuit Court of Dade County, seeking damages in the amount of $1,000,000.00 plus interest on the basis that the defendants breached an implied covenant not to deliberately destroy the source of Zable’s contingent income, i. e., the leasehold mortgage. The defense interposed by the defendants basically asserted that all of the transactions which led to the extinguishment of the mortgage were carried forth in good faith, and with absolute and reasonable business justification. In support of their position, the defendants offered evidence which tended to show that the Ambassador Hotel had been operating at a net loss since as early as 1961; that an inordinate amount of money would be required to restore the hotel to profit-making capacity; that the economic factors affecting Atlantic City, New Jersey, made such improvements and investments in the Ambassador Hotel unreasonable and impractical.
In addition to the above affirmative defense of business justification, the defendants generally denied the thrust of the plaintiff’s complaint, and argued that they violated no' expressed or implied terms of the Settlement Agreement when they obtained releases from Margolins; and further, that it was never the intention of the *275 parties to prohibit Tisch or Americana from obtaining releases of liability on the Ambassador lease.
Against the above factual background, we must now turn to the arguments of law which have been advanced by the parties. The first point on appeal raised by the appellants is that there was no express or implied term of the Settlement Agreement which was breached by them, and therefore that the trial court erred in its judgment. However, the appellee points out that when the lease was surrendered, by means of a release which was financed by the appellants, such action forever and irrevocably precluded the occurrence of any conditions which would have allowed Zable to collect the remaining $1,000,000.00. Not a single condition or contingency necessary for payment to Zable of the remaining $1,-000,000.00 had been conclusively precluded prior to January 29, 1965. Proceeding further, appellee cites numerous cases, not only from Florida but also from other jurisdictions, where the rule of law stated by the reviewing court was as follows: Where a promise to pay is restricted to a particular fund or source, and the failure to realize payment is due to the promisor’s destruction of that fund or source, the payment becomes absolute. Florida Boca Raton Housing Ass’n v. Marqusee Associates of Florida, Inc., Fla.App.1965, 177 So.2d 370. See also Malcolm MacDowell and Associates v. Ecorse-Lincoln Park Bank, 1949, 325 Mich. 591, 38 N.W.2d 921; Jordan v. Busch, 1936, 285 Ill.App. 217, 1 N.E.2d 745.
As further authority for his position, ap-pellee has also directed our attention to 17A C.J.S. Contracts § 468, where it is stated:
“ * * * Each party to a contract impliedly agrees not to prevent, or do anything to prevent, the other party from performing * * * and not to render performance impossible by any act of his own. Furthermore, a promise to perform a particular act implies a promise not to perform an inconsistent act. [Citations omitted; emphasis added.]
This authority is cited in connection with the fact that Tisch Hotels, Inc. caused a destruction of any possibility of collection on the mortgage (which event occurred, in fact, during the month when the first contingent payment would have accrued). This contention has merit. In the express covenant against accepting a voluntary re-conveyance, footnote 1 supra, there is also inherent the implication that the promissors, appellants, will perform no acts inconsistent therewith. That is to say, by obtaining the releases from Margolins, the appellants achieved indirectly that which they could not do directly. The six contingencies regulating Zable’s rights to payment of up to a maximum of $1,000,000.00 were all bottomed on the inherently implied duty of the appellants not to destroy the source of such payment.
As to the appellants’ contention that reasonable business justification existed, so as to legally condone their actions in obtaining the releases, the appellee points out that only the appellants themselves were those served by the “business purpose” here sought. This argument also has merit, for the record shows that the Americana Hotel, Inc. was the primary obligor under both the Settlement Agreement and the Ambassador lease, while Tisch Hotels, Inc., as guarantor, guaranteed the full performance by Americana on both instruments. Although evidence was submitted by both sides of this case as to the actual profit-making capacity of the Ambassador the trial judge accepted the thrust of the plaintiff’s case when he concluded that the true motivation and business purpose behind the transaction which was arranged by Tisch Hotels, Inc., was to destroy the lease and permanently relieve Tisch Hotels, Inc. of any liability thereon as well as to foreclose any possibility of Zable recovering on the Settlement Agreement.’ We cannot disagree with the trial court’s finding in this respect and reject the appellant’s argument as it relates to the so-called “business purpose” rule.
We find a striking similarity to the instant facts in the cases of Ebberts v. Car *276 penter Production Co., Tex.Civ.App.1953, 256 S.W.2d 601, and Jordan v. Busch, supra. In the Ebberts case, an oil lease had been sold to the defendant-grantee, under which he agreed to pay to the grantor the total sum of $5,000.00, payable however, out of the proceeds of any oil obtained from the production of a certain well, “ * * * now situate on said property but not producing”. There was an understanding between the parties that “no part of the oil payment hereby provided for shall be payable to grantor except it be paid from the proceeds of oil produced and sold * * id. at 606. The defendant literally destroyed the wells upon whose production payment was conditioned by removing the well casings. The court awarded the total maximum payment due to the plaintiff, and held as follows :
“ * * * since the destruction of the wells resulted in the total destruction of the subject matter of these promises and of the value of these promises, the prom-isee Ebberts was entitled to recover the full value of these promises as damages. This would be the maximum amount of the oil payment on Lot 9 if the destruction of the wells made it impossible for the plaintiff to show whether the various conditions on which the promises depended would have occurred if the defendant had done as agreed. * * * Thus, if it were to be proved that no one could now say whether the wells in which the oil payments were reserved could have been reconditioned and if so, whether any oil could have been produced through them and if so, how much oil, the promisee Eb-berts would be entitled to recover the entire amount of the oil payment in Lot 9, that is $5,000.00.”
In the Jordan case, supra, an attorney had promoted a brewery enterprise in which two of the defendants acquired stock and the third defendant acquired a job. In lieu of monetary payment or a position with the company, the attorney obtained payment for services rendered by an agreement which provided that the defendants would pay him fifty-nine equal monthly payments to be made “only from the salaries and dividends received by” the three defendants, “but in no event shall the total of the amounts paid [to the attorney-plaintiff] exceed the said sum of $12,500.00 nor shall any of said amounts bear any interest.” In other words, the attorney had bargained for contingent payment, conditioned upon the receipt of salary and dividends by those owing him money, up to a specified maximum amount. After payments to the plaintiff, amounting to $300.00 the three defendants resigned their positions with the corporation and the two owning stocks sold their shares. They thereafter refused to pay the plaintiff. Plaintiff sued on the theory that the defendants’ conduct had “made impossible the performance of a condition precedent, upon which [the defendants’] liability * * * was made to depend,” and that such actions “produced the effect of alienating the source of the funds from which the payments were to be made.” The trial court awarded judgment for the full balance of $12,200.00. In an extensive opinion, the appellate court held as follows:
“There can be no denial that the defendants, having sold their stock, which of course would alienate the possibilities of a dividend, and ceasing to be employed by the company which would eliminate the possibility of salary, did for all practical purposes prevent the carrying out of the contract by its terms. Under these circumstances, the plaintiff could not hope to recover according to the terms of the contract.
“The rule of law is that when a party agrees to pay out money from a fund which is derived only from a certain source, this condition is for the benefit of the promisor, and, if he alienates the source of that fund, he cannot escape liability. It is a principle of fundamental justice that if a promisor himself is the cause of a failure of performance either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure.
*277 * * * * * *
“ * * * By selling the interest and control in the property, they voluntarily put it out of their power ever to realize any dividends from the brewery or to employ the plaintiff. Consequently, the payments due under the contract became due and payable eo instanti. Wolf v. Marsh, 54 Cal. 228.
* * * * * *
“We are of the opinion that the payments under the contract became due upon the sale by the defendants of their stock in the company and the surrendering of their control of the same, and we are further of the opinion that the amount of damages found to be due and owing to plaintiff [total amount promised the plaintiff] was correctly decided by the trial court.” Id. 1 N.E.2d at 748.
We find logic and authority in the two excerpts recited above and hereby affirm the trial court’s finding of liability.
Having therefore found the appellants liable for the acts which the appellee alleged were those which destroyed his rights under the Settlement Agreement, we must next determine whether the measure of damages as applied by the trial court was correct. It must be recognized initially that the appellants actively interfered with the ap-pellee’s rights and source of income under the Settlement Agreement.
Under Count I of the plaintiff’s complaint, once the allegations therein were proven, the conditional promise to pay was rendered absolute. This result has been arrived at by various means according to different cases. The doctrine of estoppel was used to disallow the defendants to “ * * * insist on the plaintiff’s furnishing proof of [that] which the defendant’s own act had deprived them.” Ebberts v. Carpenter Production Co., supra.
In Florida Boca Raton Housing Ass’n v. Marqusee Assoc., supra, this court held that once the source of payment to the promisee had been effectively sold or assigned, such conveyance constituted an “acceleration” of payments within the meaning of a provision that the promise would be accelerated if payment of the source, a mortgage interest as in the case at bar, were accelerated. That holding thus caused the entire payment to the promisee to become due after the act of the promisor (assignment or sale of the mortgage interest) had alienated the source of payment. See also Jordan v. Busch, supra, (entire payment to promisee, contingent on salaries and dividends to be received by promisors in the future, “ * * * became due and owing eo instan-ti’’ when promisors alienated source of their funds, i. e., jobs and stock.)
We therefore find no reason to disturb the assessment of damages arrived at by the trial judge.
The appellants finally contend that error was committed in the computation of interest on the damages ascertained. The promise to conditionally pay the $1,000,000.-00 became absolute and payable upon the active breach of contract which was committed on January 29, 1965. This was the holding of the trial court and has been well settled by the case of Huntley v. Baya, Fla.App.1962, 136 So.2d 248. See also Florida Home Insurance Company v. Braverman, Fla.App.1964, 163 So.2d 512, which held that notwithstanding the fact that the plaintiff’s claim was unliquidated at the time of the law suit, interest should be awarded from the date that the obligation accrued, here the date of the active breach of the Settlement Agreement.
Thus, because of the foregoing reasons and principles of law, the final judgment being append is hereby affirmed.
Affirmed.

. The provisions setting forth circumstances which would allow Zable to collect up to $1,000,000.00 in the aggregate are as follows:
(A) Provisions for payment to Zable which may occur before foreclosure of the mortgage: (1) As mortgage payments mature, (starting January 30, 1965 and payable annually until 1974) and are made from Atlantic City Hotels to Tisch Hotels, Inc. and Americana Hotel, Inc., Zable is to receive $1.00 for every 950 of said payment, i. e., ratio of mortgage payments payable to Zable is loo/l9S; (2) if Americana Hotel, Inc. and Tisch Hotels, Inc., sell mortgage, they will pay to Zable one-quarter of the profit up to a maximum of $1,000,000.00.
(B) Provisions providing for payment to Zable in the event of foreclosure of the mortgage: (1) If the leasehold interest is sold to an outside bidder at foreclosure sale, Americana Hotel, Inc., and Tisch Hotels, Inc., will owe and pay to Zable one-quarter of the net proceeds of tlie sale up to a maximum of $1,000,-000.00. The agreement allows Zable to bid at such foreclosure sale.
(C)Provisions providing for payment to Zable after foreclosure of the mortgage: (1) If the leasehold interest is bought by Tisch Hotels, Inc., or any. of its entities at the foreclosure sale, Zable will be paid one-quarter of the net operating profits from operations of the Ambassador Hotel, or sub-letting of the Ambassador Hotel, up to a maximum of $1,000,000.00; (2) if the leasehold interest is sold after acquisition by Americana Hotel, Inc., and/or Tisch Hotels, Inc. at the foreclosure sale, Zable is paid one-quarter of the profits from such sale, up to a maximum of $1,000,000.00; (3) if the lease is surrendered after acquisition by an entity of Tisch Hotels, Inc. at the foreclosure sale, and such surrender is for a valuable consideration, Zable is paid one-quarter of the excess of the valuable consideration over the cost basis.